**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Carr*, **Slip Opinion No. 2022-Ohio-3633.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3633

DISCIPLINARY COUNSEL *v*. CARR.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Carr*, Slip Opinion No. 2022-Ohio-3633.]**

*Judges—Misconduct—Violations of the Code of Judicial Conduct—Multiple violations, including improperly issuing capias warrants, engaging in improper plea bargaining and ex parte communications, issuing arbitrary dispositions, improperly using capias warrants and bonds to compel payment of fines and costs, exhibiting lack of decorum and dignity commensurate with judicial office, abusing contempt power, and failing to recuse—Indefinite suspension with conditions for reinstatement—Immediate suspension from judicial office without pay.*

(No. 2021-1518—Submitted April 12, 2022—Decided October 18, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2020-054.

_____

**Per Curiam.**

{¶ 1} Respondent, Pinkey Suzanne Carr, of Cleveland, Ohio, Attorney Registration No. 0061377, was admitted to the practice of law in Ohio in 1993. Since January 2012, she has served as a judge of the Cleveland Municipal Court. She previously served for 13 years as an assistant prosecuting attorney for Cuyahoga County.

{¶ 2} In a March 2021 amended complaint, relator, disciplinary counsel, charged Carr with five counts of judicial misconduct. Each count set forth numerous instances of misconduct that occurred over a period of two years and shared common elements that fall into one or more of the following categories: (1) issuing capias warrants and making false statements, (2) engaging in ex parte communications and improper plea bargaining and rendering arbitrary dispositions, (3) using capias warrants and bonds to improperly compel payment of fines and court costs, (4) exhibiting a lack of decorum and dignity in a judicial office, and (5) abusing contempt power and failing to recuse herself from contempt proceedings in which she had a conflict.

{¶ 3} The parties entered into 583 stipulations of fact and misconduct that span 126 pages and submitted more than 350 stipulated exhibits. The hearing before a three-member panel of the Board of Professional Conduct was bifurcated to afford Carr additional time to develop mitigating evidence.

{¶ 4} The panel accepted the parties' stipulations of fact and misconduct and issued a 58-page report recounting limited—but representative—examples of Carr's admitted misconduct. The panel found that Carr "ruled her courtroom in a reckless and cavalier manner, unconstrained by the law or the court's rules, without any measure of probity or even common courtesy" and that she "conducted business in a manner befitting a game show host rather than a judge of the Cleveland Municipal Court." The panel concluded that Carr's actions "could not help but seriously compromise the integrity of the court in the eyes of the public

and all who had business there." After weighing the applicable aggravating and mitigating factors, the panel recommended that Carr be suspended from the practice of law for two years and that certain conditions be placed on her reinstatement to the profession. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. The board further recommended that, in accordance with Gov.Jud.R. III(7)(A), Carr be immediately suspended from judicial office without pay for the duration of her disciplinary suspension.

{¶ 5} Carr raises three objections to the recommended sanction. She argues that the board applied the wrong legal standard and failed to accord proper mitigating effect to her mental-health disorders. She further contends that the circumstances here support the imposition of a two-year suspension with 18 months conditionally stayed.

{¶ 6} We adopt the board's findings of misconduct. For the reasons that follow, we overrule Carr's objections, reject the two-year suspension recommended by the board, indefinitely suspend Carr from the practice of law, and immediately suspend her from judicial office without pay for the duration of her disciplinary suspension.

## I. MISCONDUCT

### A. Count One—Issuing Capias Warrants and Making False Statements

{¶ 7} In March 2020, Judge Michelle Earley, the administrative and presiding judge of the Cleveland Municipal Court, issued an administrative order suspending most courthouse activity in an effort to help prevent the spread of COVID-19. Judge Earley ordered that all civil and criminal cases set for hearing between March 16 and April 3, 2020, be rescheduled for three weeks after the originally scheduled date. The order directed the clerk of courts to issue summonses to all of the affected criminal defendants, compelling them to appear on the newly scheduled date, and similarly directed that all parties to the affected civil cases be notified of the postponement.

{¶ 8} Despite Judge Earley's order, Carr did not reschedule cases set on her docket.  On Monday, March 16, she presided over her regular docket—including eight criminal cases in which the defendants had not been jailed.  In each of those cases, Carr issued capias warrants for the defendants who did not appear in court.  Her verbal statements on the record and her journal entries noted the defendants' failure to appear; she issued capias warrants for their arrest and set bonds ranging from $2,500 to $10,000.

{¶ 9} In contrast, Carr waived fines and court costs for defendants who were "brave enough" to appear in court despite the potential for exposure to COVID-19.  And Carr informed the public defender assigned to her courtroom that defendants represented by that office should continue to appear in court contrary to the court's press release regarding the administrative order.

{¶ 10} On Tuesday, March 17, Carr presided over her regular docket as though the administrative order had never been issued.  Only a few nonjailed defendants and their counsel appeared.  Carr issued capias warrants and set bonds for seven defendants who did not appear.  When the public defender assigned to Carr's courtroom asked whether his clients should plan to be in court the following day, Carr stated that they should.  The public defender then mentioned the administrative order and asked if there was any concern regarding COVID-19, but Carr replied that not everyone watches the news and that the public defender should not tell people to not show up, because she would be in court.  Shortly after the public defender left the courtroom, Carr turned to her staff and mocked him, calling him a "little idiot."

{¶ 11} After clearing her March 17 docket, Carr learned that pursuant to the administrative order, Matthew Woyma, the person responsible for scheduling the court's cases, had cancelled her civil docket for March 26.  In open court, she instructed her bailiff to tell Woyma "to get his ass back on that phone and put all [her] civil cases back on."  Woyma had already sent written notices of

postponement to all parties. As a result of Carr's directive, Woyma had to notify every party to appear in court as originally scheduled.

{¶ 12} On March 17, *The Plain Dealer* published an article on its website, Cleveland.com, with the headline "Cleveland judge flouts court's postponements amid coronavirus pandemic, issues warrants for no-shows." *See* https://www.cleveland.com/court-justice/2020/03/cleveland-judge-flouts-courts-postponements-amid-coronavirus-pandemic-issues-warrants-for-no-shows.html (accessed July 25, 2022) [https://perma.cc/4U2E-U9UM]. Carr continued to conduct hearings.

{¶ 13} Throughout the morning of March 18, Carr criticized Cleveland.com for accurately reporting that she was issuing warrants for people who did not come to court. Between proceedings, Carr granted an interview to a reporter from a local television station in which she claimed that the Cleveland.com article was "untrue" and "reckless." She also denied issuing any arrest warrants for defendants who had failed to appear for proceedings in her courtroom that week. After the interview, Carr continued to talk with the reporter who asked, "And you are not, to be clear, you are not issuing any warrants?" Carr replied, "Absolutely not." However, that statement was untrue.

{¶ 14} In a text-message exchange with Judge Earley later that day, Carr continued to falsely characterize her actions. When Judge Earley asked Carr if she was issuing warrants for people who failed to appear, Carr responded, "Too late to ask that ridiculous question. My [journal entries] reflect corona day 1, 2, or 3. Time case was called and no defendant or [failed to appear] in which my journalizer notes NO WARRANT TO ISSUE." (Capitalization sic.) That statement was patently false because none of Carr's journal entries included the phrase "no warrant to issue." On March 20, the print edition of *The Plain Dealer* published an editorial about Judge Carr's continuing to hold court in spite of the administrative order.

*Judge Carr Put People at Risk in Defying Order of Court*, The Plain Dealer (Mar. 20, 2020) E2.

{¶ 15} The board found that Carr's failure to follow the administrative order proved to be a costly burden to the administration of justice. When Judge Earley learned that Carr had, in fact, issued arrest warrants, she had to review all of Carr's entries, recall the warrants, set bonds, and issue summonses for the next court appearances. She also had to reschedule the civil cases that Carr had reset for March 26.

{¶ 16} The Office of the Public Defender for Cuyahoga County filed a complaint in the Eighth District Court of Appeals seeking writs of mandamus and prohibition to compel Carr's compliance with the administrative order. That office also filed an affidavit of disqualification with the chief justice of this court, alleging that Carr had acted with a "calculated bias and disregard" for the welfare of those named in the affidavit and all other defendants appearing before her. The court of appeals granted alternative writs of mandamus and prohibition, sua sponte, ordering Carr to comply with Judge Earley's March 13, 2020 administrative order and issuing a stay of all orders and capias warrants issued by Carr after that date, and the chief justice disqualified Carr from presiding over the criminal and traffic cases of nonjailed defendants for the duration of Judge Earley's order.

{¶ 17} The board found that Carr "very publicly flouted her disregard of a court order that was designed to ensure the safety of the public and the court's personnel during the pandemic," that she punished members of the public who followed the administrative order and lied about it to the press and to the presiding administrative judge of her court, and that she thereby created the very danger that the order sought to prevent—the spread of the coronavirus in open court.

{¶ 18} The parties stipulated, the board found, and we agree that Carr's conduct violated Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of

the judiciary, and to avoid impropriety and the appearance of impropriety), 2.2 (requiring a judge to uphold and apply the law and to perform all duties of judicial office fairly and impartially), 2.5(B) (requiring a judge to cooperate with other judges and court officials in the administration of court business), and 2.8(B) (requiring a judge to be patient, dignified, and courteous with litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity) and Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

### B. Count Two—Ex Parte Communications, Improper Plea Bargaining, and Arbitrary Dispositions

{¶ 19} The parties' stipulations describe 34 cases in which Carr engaged in ex parte communications and improper plea bargaining with defendants and made arbitrary rulings between May 2019 and December 2020.

{¶ 20} In open court on June 15, 2020, Carr unabashedly told her staff, "[T]he prosecutor isn't here. Let's see how much we can get away with." Similarly, in open court on June 18, 2020, Carr told one defendant, "Well the prosecutor isn't here, so we need to get as many of these done before he or she gets here * * *." She then offered that defendant a plea deal that he accepted. Carr admitted that she routinely conducted hearings without a prosecutor being present so that she could avoid complying with the requisite procedural safeguards set forth in R.C. 2937.02 et seq. (requiring a judge to inform the accused, among other things, of the nature of the charge, the identity of the complainant, the right to counsel, and the effect of a plea of guilty, not guilty, or no contest) and Crim.R. 11 and Traf.R. 10 (both requiring a judge to engage in a personal colloquy with the accused to ensure that a plea is knowingly and voluntarily entered). Carr also unilaterally recommended pleas to unrepresented defendants when no prosecutor was present and accepted the pleas without explanation or discussion of the

consequences of entering the plea, as required by Crim.R. 11 and Traf.R. 10. In at least 6 of the 34 cases identified in this count, Carr unilaterally amended the charges against the defendant and falsely attributed those amendments to the prosecutor in her judgment entries.

{¶ 21} After unilaterally entering no-contest pleas on behalf of defendants, Carr routinely found them not guilty of the charged offenses. But even when she found defendants guilty, she arbitrarily waived fines and costs without any inquiry into the defendant's ability to pay. She then falsified her journal entries to conceal her actions. In fact, Carr frequently stated that she was waiving fines and costs based on the defendant's birth date or its proximity to the date of the hearing, a holiday, her own birthday, or the birth dates of her family and friends—even when the prosecutor was present in her courtroom. Carr's entries in at least 24 of the 34 cases identified in Count Two falsely stated that she had conducted ability-to-pay hearings and had determined that the defendants were unable to pay fines or costs.

{¶ 22} For example, M.T. was charged with speeding, a fourth-degree misdemeanor, and a seatbelt violation, a minor misdemeanor. He was arraigned before Carr on June 15, 2020. Earlier in the day, Carr had waived a defendant's fine and costs simply because the defendant's birthday was in June. With no prosecutor present, Carr told M.T., "I'll give you the same deal, even though your birthday is in September." She then asked M.T. whether he would like to plead guilty to a nonmoving violation. M.T. nodded his head, and Carr replied, "Yeah, yeah, yeah. I see your birthday is in September. We'll waive your fine and cost. Okay. Good-bye. You're free to leave."

{¶ 23} M.T. did not orally enter a plea, nor did Carr advise him of the consequences of entering a plea. Yet Carr dismissed his speeding charge and entered a guilty plea to the seatbelt offense. On the journal entry, Carr wrote, "Fine & cost waived." She also checked boxes falsely indicating that she had conducted a hearing regarding M.T.'s ability to pay a fine and costs and that she had found

him indigent and waived costs when, in fact, she had conducted no such hearing. The prosecutor entered the courtroom as Carr spoke with M.T., but he took no part in M.T.'s case. After the prosecutor informed Carr that he was the prosecutor for her courtroom that day, Carr said, "Oops, prosecutor's here," and her staff laughed.

{¶ 24} Similarly, M.H. was charged with fourth-degree-misdemeanor open-container and loud-noise offenses. The prosecutor was not present when M.H. appeared before Carr for his arraignment. Carr asked M.H. how he wanted to proceed, and he stated that he wanted to plead no contest to both offenses. Carr suggested that she amend the loud-noise charge to a minor misdemeanor and let him plead to that offense so that he would not have an alcohol-related offense on his record. She also told him that that course of action would allow him to avoid a mandatory fine of $75 and require him to pay just $5, plus court costs. On the journal entry under "Prosecutor Amends Charge," Carr wrote "601.08," which refers to the charge of attempting to commit an offense. *See* Cleveland Codified Ordinances 601.08. However, it was Carr—not the prosecutor—who unilaterally amended the charge.

{¶ 25} Carr's practice of issuing journal entries falsely attributing amended charges to the prosecutor or falsely stating that she had conducted ability-to-pay hearings may violate Ohio laws, including R.C. 2921.13, which provides that a person who knowingly makes a false statement (1) in any official proceeding, (2) on a form, record, or other writing that is required by law, or (3) in a document that purports to be a judgment and is filed with the clerk of a court of record, commits the offense of falsification, a first-degree misdemeanor. *See* R.C. 2921.13(A)(1), (11), and (13); *see also* R.C. 2921.13(F)(1).

{¶ 26} Based on the parties' stipulations and the evidence adduced at the hearing, the board found that Carr's conduct violated Jud.Cond.R. 1.2, 2.2, 2.8(B), and 2.9(A) (prohibiting a judge from initiating, receiving, permitting, or considering ex parte communications, except in specifically enumerated

circumstances) and Prof.Cond.R. 8.4(c) and 8.4(d). We adopt these findings of misconduct.

### C. Count Three—Improper Use of Capias Warrants and Bonds to Compel Payment of Fines and Costs

{¶ 27} Under Loc.R. 4.07 of the Cleveland Municipal Court, at the time of sentencing, a defendant may request time to pay their fines and costs. The sentencing judge may grant that request and set the payment due date. The defendant is then directed to the clerk's office to complete a time-to-pay ("TTP") contract. *See* Loc.R. 4.07(A)(1). If the defendant cannot pay the fine by the due date, the defendant can file a motion to set an ability-to-pay hearing, which the clerk's office sets before the sentencing judge. *See* Loc.R. 4.07(B)(3)(b).

{¶ 28} In her answer to relator's amended complaint, Carr stated that she was "unaware of the dictates of Local Rule 4.07 of the Cleveland Municipal Court." However, in her testimony during the disciplinary hearing, Carr stated that in 2017, her bailiff told her that the clerk's office had a very low success rate when it came to actually collecting fines levied by the court. Carr interpreted the bailiff's statements as a suggestion that she ignore Loc.R. 4.07, and she followed that suggestion. As a result, when a defendant was convicted of an offense, Carr would set a date for the defendant to pay his or her fines and costs. Immediately after imposing the defendant's sentence and without any motion by the defendant, Carr would set her own ability-to-pay hearing to occur a few days after the TTP due date—without notifying the defendant or the clerk's office. When the defendants failed to appear for those hearings, Carr would issue a capias warrant and set a bond between $2,500 and $25,000 based on the defendant's failure to pay fines and costs that were typically just hundreds of dollars. She would then write on the journal entry, "Post bond or pay fines and costs in full. No [Community Work

Service]/TTP."[1]  She would also stamp on the journal entry "DEFENDANT DOES NOT QUALIFY FOR IN THE NEIGHBORHOOD OR OVER THE COUNTER. JUDGE PINKEY S. CARR."[2]  (Capitalization sic.)

{¶ 29} Carr admitted that by precluding defendants from participating in those programs, she ensured that they would be arrested and held on the bonds set in her journal entries.  Carr stipulated that "by tying the bond to the amount of the fine and costs, [she was] compelling the payment of fines and costs through incarceration, which is contrary to the law."  *See* R.C. 2947.14 (requiring a judge to conduct a full hearing regarding an offender's ability to pay a fine—during which the offender has the right to be represented by counsel, to testify, and to present evidence—and permitting a judge to commit an offender to a jail or workhouse upon finding that the offender is able to pay a fine but refuses to do so).

{¶ 30} The board noted that this court had issued Carr a bench card outlining court practices for collecting costs and fines in adult courts; the bench card is replete with citations to caselaw and statutes indicating that a person's ability to pay must be considered when assessing and collecting fines.  *See Collection of Court Costs & Fines in Adult Trial Courts*, available at https://www.supremecourt.ohio.gov/publications/jcs/finescourtcosts.pdf (accessed Aug. 2, 2022) [https://perma.cc/M9LH-APX8].  The bench card states that a formal hearing under R.C. 2947.14 "is the sole and exclusive method for imposing a jail sentence for willful refusal to pay a fine."  *Id.*, citing R.C. 2947.14 and *State v. Ellis*, 2d Dist. Montgomery No. 22189, 2008-Ohio-2719.  Although Carr was admittedly aware of the requirements of Loc.R. 4.07 and R.C. 2947.14, she stipulated that she set up illusory hearings in the manner described above, and she

1. Community Work Service is a program for people who do not have the funds to pay fines.

2. In the Neighborhood and Over the Counter are public-service programs through the Cleveland Municipal Court clerk's office that are designed to encourage people with outstanding warrants and tickets to obtain new court dates without the fear of being arrested.

admitted that her conduct resulted in the arrest of six defendants, five of whom were incarcerated for some period of time as a result.

**{¶ 31}** Carr admitted at the disciplinary hearing that her use of capias warrants and incarceration as a means to compel the payment of fines and costs by tying the bond to the amount of the fine and costs essentially created a modern-day debtors' prison.  The board found that Carr eventually discontinued this approach to enforcing the payment of fines and costs and that she gave a "characteristically colorful explanation for doing so" in open court:

> You notice I'm no longer the bill collector for the Clerk's Office.  I'm not your b-i-t-c-h.  See, you get it?  Collect your own money.  There you go, player, mm-hmm.  Collect your own money, player, mm-hmm.  I'm not your b-i-t-c-h.  Run tell that, mm-hmm.  Mm-hmm.  How you like them apples?  Suckas.

**{¶ 32}** Carr stipulated and the board found that her conduct with respect to Count Three violated Jud.Cond.R. 1.2 and 2.2 and Prof.Cond.R. 8.4(d).  We adopt these findings of misconduct.

### D. Count Four—Lack of Decorum and Dignity Consistent with Judicial Office

**{¶ 33}** In addition to violating statutes, rules, and court orders designed to protect the legal interests of the public and the litigants in courtrooms throughout this state, Carr presided over her courtroom from a bench covered with an array of dolls, cups, novelty items, and junk that her own counsel found to resemble a flea market.  Carr testified that her bench had been that way since 2012, but that she had cleared it off a few months before her disciplinary hearing.  She also violated rules governing appropriate courtroom dress, order, and decorum.  From the appearance of her bench to the way she dressed and the way she treated the attorneys, litigants,

and staff in her courtroom, Carr undermined public confidence in the independence, integrity, and impartiality of the judiciary.

{¶ 34} Cleveland Municipal Court's website addresses appropriate courtroom dress and decorum for the public. *See Courtroom Decorum*, https://clevelandmunicipalcourt.org/judicial-services/administrative-services /central-scheduling/courtroom-decorum#:~:text=Appropriate%20dress%20is%20 required%2C%20including,exposed%20shoulders%2C%20and%20visible%20un dergarments (accessed Aug. 2, 2022) [https://perma.cc/PT67-RF3A]. It states that all persons entering the court "shall conduct themselves with deference for the Court, displaying respect for the law, the judge or magistrate, parties, counsel, deputy bailiffs, and staff." *Id*. It further identifies shorts and tank tops as "[p]otentially inappropriate dress." *Id.*

{¶ 35} Despite the dress and decorum expectations for the general public, Carr presided over her courtroom wearing workout attire, including tank tops, t-shirts (some bearing images or slogans), above-the-knee spandex shorts, and sneakers.

{¶ 36} Carr was aware that the public took notice of her unconventional appearance. She once told a defendant's counsel, "Your client was scared to come in. Officer Gray said he asked her, 'Well, where is the Judge?' She was like, 'She in there,' and he was like, 'The one in the T-shirt?' He said, 'I'm calling my lawyer.' He said, 'Un-uh. This couldn't be real.' " She then explained to counsel, "I dressed up Monday, Tuesday, and Wednesday. It's not happening today, and tomorrow is a national holiday, Juneteenth. I'm not doing it, okay?"

{¶ 37} The board found that Carr reveled in her lack of decorum, telling one defendant who apologized for his own attire, "You see how I'm dressed? I have on my Cavs' T-shirt." After another defendant expressed surprise that he had been found not guilty, Carr responded, "You can trust me. I know I'm not dressed like a judge, but I'm really the judge."

**{¶ 38}** During a series of proceedings in open court, Carr maintained a dialogue with her staff and defendants about the television series *P-Valley*, which is set in a Mississippi strip club. Carr routinely referred to one of her bailiffs, Alicia Gray, as "Ms. Puddin" (or some variation thereof) in open court, and she asked one defendant if he knew "Ms. Puddin from *P-Valley*." She teased another bailiff about driving to P-Valley to "find him that little girl with the curly blonde hair." And in another display of inappropriate humor, she announced from the bench in open court, "You know what my *P-Valley*, my name gonna be Passion. I got to go to that class though so I can learn how to climb that pole."

**{¶ 39}** Although Carr frequently behaved as though the rules of courtroom decorum did not apply to her, she did not hesitate to correct defendants for seemingly minor infractions. The video evidence shows that she repeatedly admonished defendants for standing with their hands crossed or in their pockets instead of at their sides and screamed at them when they indicated that they had not heard what she said. Carr also resented being called "ma'am" and berated defendants who attempted to show their respect for her by using that honorific. When male defendants referred to her as "ma'am," Carr would chastise them, calling them "little boy."

**{¶ 40}** On multiple occasions, Carr joked that she would be amenable to some form of bribe in return for a lenient sentence. In open court, she engaged in dialogues with defendants about accepting kickbacks on fines and arranging "hook-ups" for herself and her staff for food and beverages, flooring, and storage facilities. For example, E.W. appeared before Carr on July 22, 2020, to request that she grant him driving privileges in his 2018 case for driving under the influence of drugs or alcohol. After being informed that E.W. worked for an automotive company, Carr told her staff, "I got us another hookup. We could get our cars fixed here," and she stated that she had already gotten them some flooring and carpet. E.W. told her to bring their cars in and that the company would love to take care of them. Carr

replied, "Always getting us the hookups. Don't worry, we don't have to pay. It's on him."

**{¶ 41}** Reinstatement of E.W.'s driving privileges was subject to a mandatory $50 fee. But when E.W. indicated to Carr that he did not have the money to pay the fee, Carr said, "Well who's going to pay his $50. Puddin gets paid today, so does Mike. They both got $50, after all, you hooking us up. Maybe they will pay your $50. $50 fee waived. All right. You're all set." On the journal entry, Carr wrote "No Bitching Necessary." She then passed the journal entry to a bailiff and told him, "Show that [judgment entry] to Ms. Puddin." As Gray read the entry, Carr broke out laughing while her bailiff called the next case.

**{¶ 42}** During Carr's disciplinary hearing, her counsel questioned her about her undignified manner in the courtroom, including her loud, boisterous behavior, her use of a singsong tenor, and on at least one occasion, her use of a really loud voice when speaking to a defendant, as though the defendant would be more likely to understand her if she talked louder and slower. But Carr offered no explanation for her behavior.

**{¶ 43}** The parties stipulated and the board found that Carr's conduct with respect to this count violated Jud.Cond.R. 1.2, 2.2, 2.8(A) (providing that a judge shall require order and decorum in proceedings before the court), and 2.8(B). We adopt these findings of misconduct.

### E. Count Five—Abuse of Contempt Power and Failure to Recuse

#### 1. A.B.'s Arraignment and First Contempt Charge

**{¶ 44}** In May 2019, 20-year-old A.B. and her 19-year-old sister C.B. were arraigned before Carr. The sisters had been charged with misdemeanor counts of assault and disorderly conduct for allegedly assaulting a 16-year-old girl. Although Carr normally denied defendants personal bond when they were charged with a violent offense, she initially decided to release A.B. and C.B. on personal bond, provided that they wore global-positioning system ("GPS") monitors.

{¶ 45} For reasons that are unclear from the video recording of the arraignment, Carr made A.B. the focus of her attention. Early in the proceeding, Carr stated, "Hi, I'm up here," suggesting that A.B. may have looked away from Carr as she read the no-contact order that was a condition of A.B. and C.B.'s release. Carr said to Maggie Walsh, the public defender representing the sisters, that A.B. "is going to get plenty of time with me." While Walsh conferred with her clients, Carr gave a monologue in a singsong voice about how nice it would be to have "company" in her courtroom, and she expressed her hope that A.B.'s case would be assigned to her. She paused from time to time to laugh or hum a tune.

{¶ 46} A few minutes after Carr resumed her docket, she said, "I knew I chose wisely. I could tell, that little pleasin' personality of hers." At that point, A.B. muttered something to the deputy about the way she was being treated and Carr snapped, "What did she say? She said this Court is fucked. What did she say? Oh, okay. Corny as fuck. Okay, corny as fuck." A.B. responded, "I said corny the way you're treating me. Like, I didn't do—," then Carr interrupted her, saying, "Oh, no problem. Uh-huh. Close your mouth. Don't interrupt my courtroom. You don't want to have a problem with me. I told you that when—." At that point A.B. said something else. Carr raised her voice and twice told A.B., "Close your mouth." As A.B. continued to talk, Carr said to A.B., "Say one more thing," and then to her bailiff, "Take her in the back for me, please. Uh-huh. Bye bye."

{¶ 47} A.B. left the courtroom in tears and remained in the lockup area for several hours until Carr had her brought back to the courtroom. At that time, court staff informed Carr that while in the holding cell, A.B. had repeatedly referred to Carr as a "bitch" so loudly that another judge had to close his courtroom doors. After Walsh informed Carr that A.B. wanted to apologize to the court, Carr said that she did not need her apology. Carr informed A.B. that she was being charged with two counts of contempt of court and one count of obstruction of official business.

**{¶ 48}** After A.B. was led out of the courtroom, Carr had her brought back in because A.B. was upset that she never had a chance to explain herself. When Walsh encouraged A.B. to speak, A.B. said, "It doesn't matter. You don't care." But she continued, saying, "It doesn't matter. I've been trying to say anything. I don't even know what to say. If I say anything, it's just going against me. It doesn't matter."

**{¶ 49}** Carr asked A.B., "You think it's acceptable behavior to call me 50 bitches and say that the courtroom—this is some corny ass shit?" A.B. said, "No, I'm trying to explain myself. I walked up to the stand. You read the paper. You didn't even let me talk. You automatically changed your attitude from happy to just anything, like you was just basing me off of what—basically, just reading me off of a piece of paper." Carr started to explain that she had summoned the public defender to provide A.B. with legal counsel before she was equipped for GPS monitoring, and then she accused A.B. of rolling her eyes. A.B. denied rolling her eyes and said that she was about to cry, but Walsh claimed that A.B. was not crying. As A.B. was led from the courtroom, Carr told Walsh that she could tell A.B. had a "screw loose."

**{¶ 50}** Carr charged A.B. with three counts of contempt of court in violation of R.C. 2705.02. In an affidavit supporting those charges, Carr stated that A.B. "while in a courtroom, * * * did repeatedly refer to the court as a 'bitch,' and called the courtroom 'shit.' " But Carr did not personally hear A.B. say anything disrespectful. On the contrary, court staffers had informed Carr that A.B. had mumbled a disparaging remark about the way she had been treated in the courtroom and that A.B. had called her a "bitch" several times while in the holding cell, outside of Carr's presence.

### 2. A.B.'s First Contempt Hearing

**{¶ 51}** Despite Carr's embroilment with A.B., she failed to recuse herself from A.B.'s contempt case. On June 4, 2019, Carr called that case shortly before

9:00 a.m. A.B. was not present, because she had an appearance before another judge on the underlying assault charge. Carr asked A.B.'s counsel if he wanted to request a continuance to contact A.B.; then she said, "I would love to issue a capias, no bond." After A.B. arrived in the courtroom, Carr entered a not-guilty plea to all three charges on A.B.'s behalf, released her on a personal bond, and set a hearing date.

{¶ 52} On August 13, 2019, A.B. appeared in Carr's courtroom with counsel. She withdrew her not-guilty plea and pleaded guilty to the first charge of contempt, a fourth-degree misdemeanor. The prosecutor dismissed the remaining charges. Before imposing a sentence, Carr offered an inaccurate summary of A.B.'s actions at her arraignment, falsely stating that A.B. had said, "I don't have to look at you."

{¶ 53} Carr sentenced A.B. to 30 days in jail with 15 days suspended and five years of active probation; she imposed a $250 fine, which she suspended, and ordered A.B. to complete anger-management classes and read an apology letter aloud in open court on September 4.

*3. Presentation of A.B.'s Apology Letter and Second Contempt Charge*

{¶ 54} On September 4, A.B. appeared in court with her apology letter. A.B.'s attorney was late, and rather than wait for the attorney to arrive, Carr proceeded with the hearing. Despite the fact that A.B. had completed the sentence that Carr imposed on August 13, Carr ordered her to submit to random substance-abuse testing and to write an additional letter entitled "How would you feel if I called your mother a bitch?"

{¶ 55} Carr continued to torment A.B. before her attorney arrived and gave the courtroom audience her own—not entirely accurate—version of A.B.'s underlying offense and behavior at her May 2019 arraignment.

{¶ 56} A.B. interjected that Carr's recitation of the case to the courtroom audience was inaccurate, and she continuously interrupted Carr. After one

interjection, Carr asked, "What did she say?" Her bailiff responded, "This is bullshit." Carr responded, "This is some bullshit? Juanita, put her in the holding cell for me. Uh-hmm. Contempt charge again. Thank you. Appreciate it. In the holding cell. Bye-bye. I'm not finished with this." A.B. attempted to interrupt Carr on several occasions to explain that she had not said what was attributed to her but had said, "Oh my goodness." A.B., who was then hysterical, was taken to the holding cell.

{¶ 57} Later that morning, A.B.'s counsel appeared before Carr with A.B. Carr informed him of the events that had transpired and stated that she would be filing new contempt charges. When A.B.'s counsel asked why Carr had proceeded in his absence when she knew that A.B. was represented by counsel, Carr stated that she was just accepting the written apology from A.B. and that her bailiff had attempted to call the attorney.

{¶ 58} Carr failed to recuse herself from A.B.'s second contempt case. In October 2020, A.B. pled no contest to the second contempt charge. Carr sentenced her to 30 days in jail and ordered her to pay a $250 fine before suspending that sentence and waiving costs.

{¶ 59} A.B. appealed the five-year community-control sanction imposed in her first contempt case, arguing that it was an improper penalty. The court of appeals agreed and vacated that sanction. *See Cleveland v. [A.B.]*, 2020-Ohio-5180, 163 N.E.3d 153 (8th Dist.).

*4. Findings of Misconduct with Respect to Count Five*

{¶ 60} The board found that the video of A.B.'s arraignment demonstrated that Carr "took an immediate dislike to A.B." and that it was not apparent that A.B. had done anything to warrant 15 days in jail, mandatory drug testing, or five years of active probation. The board noted that A.B. did not act out physically, refuse a lawful order, fail to cooperate, or engage in any conduct that required her to be cited in contempt as a means to alleviate an immediate threat to the administration of

justice. *See, e.g.*, *Disciplinary Counsel v. Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, ¶ 24 (stating that because of the summary nature of punishment for a direct-contempt conviction, the obstruction must pose an imminent—not a likely or probable—threat to the administration of justice); *Disciplinary Counsel v. Repp*, 165 Ohio St.3d 582, 2021-Ohio-3923, 180 N.E.3d 1128.

**{¶ 61}** During her disciplinary hearing, Carr admitted that charging A.B. with the first contempt for rolling her eyes in court and cursing in lockup was an abuse of her discretion. She further admitted that she had antagonized A.B. from the bench, acted in a rude and discourteous manner, and instigated the incident that led her to cite A.B. in contempt for the second time. Carr offered no real explanation for failing to recuse herself from the contempt cases.

**{¶ 62}** Based on the parties' stipulations and the evidence presented, the board found that Carr's conduct with respect to A.B. violated Jud.Cond.R. 1.2, 2.2, and 2.8(B) and that her failure to recuse herself from A.B.'s contempt cases violated Jud.Cond.R. 2.11(A)(1) (requiring a judge to disqualify herself in any proceeding in which the judge's impartiality might reasonably be questioned, including when the judge has a personal bias or prejudice concerning a party or personal knowledge of the facts that are in dispute in the proceeding) and 2.11(A)(2)(d) (requiring a judge to disqualify herself in any proceeding in which the judge's impartiality might reasonably be questioned, including circumstances in which the judge is likely to be a material witness in the proceeding). We adopt these findings of misconduct.

## II. DETERMINING THE APPROPRIATE SANCTION

### A. The Board's Findings Regarding Aggravating and Mitigating Factors

**{¶ 63}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the

aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 64}** The parties stipulated and the board found that four aggravating factors and three mitigating factors are present in this case. Aggravating factors consist of Carr's dishonest or selfish motive, a pattern of misconduct, multiple offenses, and the vulnerability of and resulting harm to the victims of her misconduct. *See* Gov.Bar R. V(13)(B)(2), (3), (4), and (8). Mitigating factors consist of Carr's clean disciplinary record, her full and free disclosure to the board and cooperative attitude toward the proceedings, and her good character and reputation.

**{¶ 65}** Although the parties stipulated that Carr's counsel had advised the authors of the 57 character-reference letters about the nature of the charges against Carr, the board noted that some of those letters "specifically state[d] that the author [had] no [personal] knowledge of the allegations and stipulated facts in this matter." Moreover, the board found that as a result of Carr's misrepresentations to her own counsel, Carr's answer to relator's amended complaint *and* her counsel's correspondence soliciting character-reference letters from witnesses each falsely stated that Carr had negligently checked the box on court forms denoting that defendants had failed to appear in court and that Carr did not realize that a warrant would issue for those defendants. But Carr, in fact, had also verbally ordered the warrants to issue in each of those cases.

**{¶ 66}** In addition to the mitigating factors stipulated by the parties, Carr sought to establish that a mental disorder was a contributing cause of her misconduct. Gov.Bar R. V(13)(C)(7) provides that a disorder may be a mitigating factor when all of the following are present: a diagnosis by a qualified healthcare professional, a determination that the disorder contributed to cause the misconduct, evidence of a sustained period of successful treatment, and a prognosis from a

qualified healthcare professional that the attorney will be able to return to the competent, ethical practice of law under specified conditions.

{¶ 67} To support her contention, Carr presented the reports and testimony of Jason R. Riebe, Psy.D, a forensic and clinical psychologist who conducted a three-part, independent psychological evaluation of Carr in May and June 2021 and issued a report regarding that evaluation in July 2021. Riebe testified that in August 2021, he transitioned to serve as Carr's treating psychologist.

{¶ 68} Dr. Riebe diagnosed Carr with a generalized-anxiety disorder and with a mood disorder due to menopause, sleep apnea, and stress. Dr. Riebe conceded, however, that "mood disorder" is no longer recognized as a separate diagnostic category in the *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013). While he described the term "mood disorder" as a broad classification for several types of depressive disorders and explained that Carr experienced significant depressive symptoms, he did not diagnose her with a depressive disorder.

{¶ 69} Although he acknowledged that menopause and sleep apnea are very common conditions, he testified that in his opinion, Carr's physical disorders contributed to her mental disorders and that her mental disorders contributed to her professional misconduct.

{¶ 70} The board was troubled by Dr. Riebe's limited knowledge of the facts and lack of familiarity with the breadth of Carr's misconduct. For example, Dr. Riebe had access to more than seven hours of video from Carr's courtroom, but he admitted that he only viewed 15 to 30 minutes of that video. He further acknowledged that his diagnoses and opinions were confined to what he had observed in the small sample of video that he had reviewed and that he could offer no analysis or opinion about other instances of misconduct set forth in relator's complaint. Although Dr. Riebe stated in his report that he had reviewed the pleadings in this disciplinary case, the board found that he was unaware of the

potential consequences of Carr's failure to abide by the administrative order that was issued at the beginning of the COVID-19 pandemic, nor was he aware of the legal proceedings related to her noncompliance with that order. And Dr. Riebe testified that he was unaware of Carr's dishonesty in her answer to the charge of wrongfully issuing capias warrants in violation of the administrative order.

{¶ 71} The board also noted that Dr. Riebe relied primarily on information provided by Carr and that his findings were undermined by her dishonesty. For example, Carr lied to Dr. Riebe when she told him that she was unaware of Judge Earley's March 13, 2020 order until April 2020, and she blamed her bailiff for her purported ignorance when, in fact, she was fully aware of the order on March 16. She also told Dr. Riebe that she had committed some "unintentional clerical errors" when, in fact, she had intentionally falsified numerous journal entries. The board was also troubled by the fact that although Carr's misconduct included a pervasive and disturbing pattern of lies, Dr. Riebe testified that there was no correlation between her mental disorders and her dishonesty.

{¶ 72} Dr. Riebe testified that Carr is "a very sick individual" who requires "an extended course [of treatment] for a year. And * * * more if need be." He recommended that Carr begin a course of cognitive-behavioral and supportive psychotherapy consisting of weekly sessions. He also recommended that she meet with a psychiatrist and other physicians for a complete review of her medication regimen. In addition, he opined that Carr was capable of competently and ethically performing the activities required of a lawyer and a judge. But the board found, "Dr. Riebe walks a razor-thin line in testifying that [Carr] suffers from serious mental disorders that require a regimen of medication and at least a year of weekly sessions with a psychiatrist and a psychotherapist, but nevertheless is not so seriously impaired as to render her incapable of continuing to serve as a judge."

{¶ 73} As of the November 2021 hearing on mitigation, Carr had been in treatment for less than 90 days. Dr. Riebe noted that while Carr had complied with

treatment and was making progress, she still required an extended course of treatment and possessed personality traits that presented challenges to that treatment. Specifically, he found that her tendency to present herself in a favorable light, her lack of self-awareness, and her reluctance to discuss her problems could signal an unwillingness to commit to treatment. In his testimony before the panel, he also agreed that personality traits can be long-standing and difficult to change.

{¶ 74} Although the board accepted Dr. Riebe's diagnoses and treatment recommendations, it did not accept his conclusion that Carr's misconduct—having occurred primarily in 2019 and 2020—could be attributed to his post hoc observation of anxiety and depressive symptoms in May 2021. By that time, Carr's disciplinary action had been pending for eight months. The medical records summarized in Dr. Riebe's report establish that Carr had been diagnosed with menopause and sleep apnea several years before her misconduct occurred. Moreover, those same medical records do not document any signs of depression or anxiety during the time when her misconduct occurred. On the contrary, they state that Carr's menopausal symptoms had improved with medication and that Carr was sleeping well. Indeed, at many of her medical appointments, she reported that she was doing well or feeling great.

{¶ 75} Finally, in contrast to Dr. Riebe's assessment that Carr suffered from anxiety and an unspecified depressive disorder at the time of her misconduct, the board found that the 57 letters attesting to Carr's character and the testimony of two character witnesses submitted on Carr's behalf describe a person who was "the very antithesis of depressed and anxious." Those character witnesses attested to the positive character and cheerful nature Carr exhibited in church, in her community-service activities, and in her social interactions with others. One character witness described Carr as "always pleasant, respectful, witty, humorous, hard working and the life of the party," while another stated that she adored Carr's "positive vibe." Yet a third stated that Carr's "easy, outgoing nature and quick wit make her a joy

to be around both in crowds and one-on-one" and that Carr "is the sun around which all her friends revolve."

{¶ 76} Notably, in a character-reference letter, Gray (one of Carr's bailiffs, whom she referred to as "Ms. Puddin") suggested that Carr's depression and anxiety were the result, rather than the cause, of her disciplinary problems:

> Judge Carr has definitely changed since all the articles in the newspaper and this case began in March of 2020. She is still caring and pleasant but more serious and very slow to respond. Judge Carr loves her job, the defendants and employees. But when we take our lunchtime walks, people often ask her if she's still a judge because of all the negative newspaper articles. Although she never says anything, I know it bothers her because it upsets me.

{¶ 77} On those facts, the board found that Carr had failed to establish a causal link between her current mental disorders and her past misconduct and questioned whether the short duration of Carr's treatment and her reluctance to accept her therapist's opinion of her condition would have been sufficient to establish a sustained period of successful treatment as required by Gov.Bar R. V(13)(C)(7)(c). Nevertheless, the board attributed some mitigating effect to Carr's voluntary commitment to comprehensive mental- and physical-health evaluations, her adherence to Dr. Riebe's treatment plan, and her decision to enter into a contract with the Ohio Lawyers Assistance Program ("OLAP"). *See* Gov.Bar R. V(13)(A) (directing the board to consider all relevant factors and the aggravating and mitigating factors set forth in that rule in determining the appropriate sanction for professional misconduct).

{¶ 78} The board also acknowledged that Carr appeared to sincerely regret her misconduct and her betrayal of the public trust. Carr testified that she has

sought counsel from Cuyahoga County Common Pleas Court Judge Joan Synenberg, whom she considers to be a mentor, and has solicited constructive criticism from practicing attorneys and court personnel. While the board accepted Carr's representations that her behavior has improved, it noted that Carr could not escape sanction simply because her improved conduct did not appear to pose an imminent threat to the public at the time of her disciplinary hearing.

### B. Carr's Objections to the Board's Rejection of Her Diagnosed Mental Disorders as a Mitigating Factor

{¶ 79} Carr objects to the board's rejection of her mental disorders as a mitigating factor and contends that the board applied the wrong legal standard in evaluating those disorders. She seeks to have the case remanded for further analysis under the appropriate legal standard. Specifically, Carr contends that the board applied a "causal link" standard when the rule calls for proof that the disorder "contributed to cause the misconduct," Gov.Bar R. V(13)(C)(7)(b). We find that Carr's argument presents a distinction without a difference.

### C. The Board Properly Rejected Carr's Mental Disorders as a Mitigating Factor

{¶ 80} In summarizing the requirements of Gov.Bar R. V(13)(C)(7), we have previously stated that in order to qualify as a mitigating factor, there must be

> (a) a diagnosis by a qualified health-care professional, (b) a *causal relationship* between the disorder and the misconduct, (c) a sustained period of successful treatment, and (d) a prognosis from a qualified health-care professional that the attorney will be able to return to the competent, ethical, and professional practice of law.

(Emphasis added.) *Warren Cty. Bar Assn. v. Vardiman*, 146 Ohio St.3d 23, 2016-Ohio-352, 51 N.E.3d 587, ¶ 14, fn. 3. *See also Disciplinary Counsel v. Engel*, 154

Ohio St.3d 209, 2018-Ohio-2988, 113 N.E.3d 481, ¶ 11, fn. 1; *Disciplinary Counsel v. Joltin*, 147 Ohio St.3d 490, 2016-Ohio-8168, 67 N.E.3d 780, ¶ 22 (finding that "the evidence was insufficient to establish that Joltin suffered from a mental disorder that was *causally related* to his misconduct" [emphasis added]); *Cleveland Metro. Bar Assn. v. King*, 159 Ohio St.3d 122, 2019-Ohio-4715, 149 N.E.3d 444, ¶ 10 (finding that an attorney had not sufficiently demonstrated that his mental or alcohol-use disorders were "*causally related* to his misconduct," [emphasis added]); *Disciplinary Counsel v. Rumizen*, 156 Ohio St.3d 575, 2019-Ohio-2519, 130 N.E.3d 283, ¶ 12 (rejecting a respondent's mental disorder as a mitigating factor when "the board found the *causal connection* between the disorder and his underlying misconduct 'to be thin, at best' " [emphasis added]). Under this caselaw, there must be a causal nexus between a respondent's mental disorders and the misconduct in order for the respondent's mental disorders to qualify for mitigating effect—i.e., the disorders must be shown to have "contributed to cause" the misconduct.

{¶ 81} In this case, the board cited numerous reasons for rejecting Dr. Riebe's opinion that Carr's diagnosed mental disorders contributed to cause her misconduct, not the least of which are (1) Dr. Riebe's lack of familiarity with the full extent of Carr's misconduct, (2) his admission that Carr's diagnosed disorders did not account for her repeated acts of dishonesty, (3) evidence demonstrating that Carr did not exhibit symptoms of depression or anxiety in other aspects of her life or report such symptoms to her treating medical professionals, and (4) Carr's admission that she had engaged in the same types of misconduct alleged in Count Two of relator's amended complaint prior to 2018 and that her conduct in those instances was not affected by her physical or emotional issues but that it was just her judicial style.

{¶ 82} We conclude that the board applied the proper legal standard in evaluating Carr's mental disorders for mitigating effect and that the evidence

overwhelmingly supports the board's rejection of Dr. Riebe's opinion that those disorders contributed to cause Carr's misconduct. We also reject Carr's contention that *Disciplinary Counsel v. Johnson*, 131 Ohio St.3d 372, 2012-Ohio-1284, 965 N.E.2d 294, and *Disciplinary Counsel v. Chambers*, 125 Ohio St.3d 414, 2010-Ohio-1809, 928 N.E.2d 1061, support her request to have this case remanded to the board "for the limited scope of consideration of mitigating evidence." Both *Johnson* and *Chambers* were before this court on default proceedings. After the respondents in those cases filed objections to the respective board reports and recommendations, we remanded those cases to the board for further proceedings, and in *Johnson*, we limited those proceedings to the consideration of supplementary mitigating evidence. Because Carr fully participated in this disciplinary proceeding, in which the hearing was bifurcated to afford her two additional months to develop her mitigating evidence, neither *Johnson* nor *Chambers* has any application here. We therefore overrule Carr's objection on this point.

{¶ 83} Having thoroughly reviewed the record, we adopt the board's findings regarding the relevant aggravating and mitigating factors.

### D. The Board Recommends That Carr Be Suspended for Two Years with Conditions on Reinstatement, and Carr Objects

{¶ 84} After weighing Carr's "breathtaking number of infractions," the aggravating and mitigating factors, and the sanctions we have imposed on magistrates and judges who have engaged in similar—although fewer—acts of misconduct, the board recommended that we suspend Carr from the practice of law for two years with no stay and immediately suspend her from judicial office without pay for the duration of her disciplinary suspension.

{¶ 85} Carr objects to the recommended sanction, arguing that it does not comport with the facts of her misconduct, the aggravating or mitigating factors present in this case, or the relevant caselaw. She contends that if those factors are properly credited and weighed, her conduct warrants a sanction no greater than a

two-year suspension with 18 months conditionally stayed. After considering Carr's arguments, the numerosity and breadth of her misconduct, the aggravating and mitigating factors, and the cases cited by the board, we overrule Carr's objections and find that the appropriate sanction is an indefinite suspension.

### E. Carr's Misconduct Warrants an Indefinite Suspension

{¶ 86} We hold judges to the highest standards of professional behavior because they are invested with the public trust. *See Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57. Canon 1 of the Code of Judicial Conduct requires judges to "uphold and promote the independence, integrity, and impartiality of the judiciary," and to "avoid impropriety and the appearance of impropriety." " 'The primary purpose of judicial discipline is to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance the public confidence in the integrity of [the judiciary].' " *Disciplinary Counsel v. Burge*, 157 Ohio St.3d 203, 2019-Ohio-3205, 134 N.E.3d 153, ¶ 36, quoting *O'Neill* at ¶ 33. However, sanctions may also serve to deter other judges and attorneys from engaging in similar misconduct. *See, e.g.*, *Disciplinary Counsel v. Horton*, 158 Ohio St.3d 76, 2019-Ohio-4139, 140 N.E.3d 561, ¶ 60, citing *In re Judicial Campaign Complaint Against Brigner*, 89 Ohio St.3d 1460, 732 N.E.2d 994 (2000), citing *In re Judicial Campaign Complaint Against Morris*, 81 Ohio Misc.2d 64, 675 N.E.2d 580 (1997).

{¶ 87} In this case, the board considered several cases in which we imposed sanctions consisting of partially stayed term suspensions on judges for misconduct bearing some resemblance to Carr's.

{¶ 88} For example, in *Disciplinary Counsel v. Medley*, 104 Ohio St.3d 251, 2004-Ohio-6402, 819 N.E.2d 273, we imposed an 18-month suspension with six months conditionally stayed on a judge who unilaterally negotiated and accepted one criminal plea outside the presence of the prosecutor and repeatedly engaged in ex parte communications with litigants. Medley also falsified a single

journal entry to conceal an ex parte communication with a politically connected judgment debtor and issued arrest warrants to facilitate the collection of default judgments in small-claims proceedings. Like Carr, Medley engaged in a pattern of misconduct, but he had previously been publicly reprimanded for other judicial misconduct and refused to acknowledge the wrongful nature of his conduct. Nonetheless, he cooperated in the disciplinary proceedings and presented evidence of his good character and unlike Carr, he did not act with a selfish or dishonest motive.

{¶ 89} The board found, and we agree, that Carr's misconduct is readily distinguishable from that of Medley based on the sheer number of Carr's offenses. While Medley accepted a single plea in violation of procedural standards and falsified a single journal entry to conceal an ex parte communication, Carr routinely undertook both actions. And while both Medley and Carr improperly used arrest warrants and bonds to compel the collection of judgments or fines, there is no suggestion that Medley ever attempted to conceal those actions with false journal entries as Carr did on numerous occasions.

{¶ 90} In *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, we imposed an 18-month suspension with six months conditionally stayed on a judge whose acts of misconduct were similar in quality and character to Carr's misconduct in this case, even though the acts of misconduct themselves differed. Parker intemperately, unreasonably, and vindictively ejected a spectator from his courtroom without cause and briefly jailed her for contempt, twice attempted to coerce plea agreements, and routinely mistreated criminal defendants and other participants in his courtroom. He also presided over a criminal case after participating in the defendant's arrest and abused the 9-1-1 emergency-response system.

{¶ 91} The aggravating and mitigating factors in *Parker* were virtually identical to those present here, except that Carr harmed multiple vulnerable victims

and largely cooperated in the resulting disciplinary proceeding, while Parker impeded the investigation of his misconduct. Although Carr was charged with fewer counts of misconduct than Parker, all but one of those counts involve repeated instances of the same misconduct. But with the exception of Parker's repeated mistreatment of courtroom participants (conduct that Carr also routinely engaged in), Parker's other acts of misconduct involved isolated incidents that were not repeated on a large scale.

{¶ 92} On the facts presented here, we conclude that Carr's refusal to comply with Judge Earley's administrative order during the COVID-19 pandemic, improper ex parte communications, improper plea bargaining and issuance of arbitrary dispositions, improper use of capias warrants and bonds to compel the payment of fines, falsification of entries, failure to recuse herself from a case in which she became personally embroiled with a defendant, and lack of proper courtroom decorum—namely, her dress, her unkempt bench, her undignified and demeaning treatment of defendants, and her efforts to obtain free or discounted goods and services—warrant a greater sanction than the 18-month partially stayed suspensions that we imposed in *Medley* and *Parker*.

{¶ 93} We have imposed suspensions of six months and of one year for misconduct arising from single instances of abuse of a court's contempt power. *See Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178 (magistrate's conduct in summarily holding a woman in direct contempt of court and jailing her for screaming outside his courtroom warranted a six-month suspension); *Repp*, 165 Ohio St.3d 582, 2021-Ohio-3923, 180 N.E.3d 1128 (judge's repeated harassment of a spectator who sat silently in his courtroom, including holding her in contempt and jailing her for refusing to comply with his unlawful order that she submit to a drug test, warranted a one-year suspension).

{¶ 94} In *Bachman*, we held that an abuse of judicial power is a significant violation of the public trust, particularly when it deprives a person of his or her

liberty. *Id.* at ¶ 33. We therefore rejected the board's recommendation of a fully stayed six-month suspension. Finding it necessary to send a strong message to the judiciary, to deter similar violations in the future, and to make crystal clear to the public that abuse of the contempt power will not be tolerated, we suspended Bachman for six months for his single incident of misconduct.

{¶ 95} The deprivation of numerous defendants' liberty occasioned by Carr's misconduct vastly exceeds the one- or two-day jail stays occasioned by the misconduct of Bachman and Repp. At least five of the victims identified in Count Three of this case spent time in jail as a result of Carr's improper use of capias warrants. And A.B. served 15 days in jail as a result of Carr's abuse of her contempt power. Furthermore, by issuing capias warrants for defendants who failed to appear for hearings in her courtroom between March 16 and March 18, 2020—hearings that Judge Earley had ordered to be continued—Carr created a risk that dozens of people would be wrongfully arrested and jailed if they were unable to pay their fines. On these facts, Carr's misconduct warrants a sanction far greater than the six-month and one-year suspensions imposed, respectively, in *Bachman* and *Repp*.

{¶ 96} The board accorded substantial mitigating effect to Carr's cooperation in the disciplinary proceedings and her commitment to a mental-health-treatment program. It found that but for those factors, her conduct would warrant an indefinite suspension. Carr now argues that in addition to those factors, her clean disciplinary record, and evidence of her good character and reputation, this court should find mitigation based on her diagnosed mental disorders and the purported imposition of another penalty or sanction by virtue of pervasive negative media coverage. We have already rejected Carr's mental disorders as a mitigating factor based on the insufficiency of the evidence regarding their contribution to her misconduct. We likewise decline to find that truthful media reports of Judge Carr's flagrant disregard of the administrative order suspending most courthouse activity in the early days of the COVID-19 pandemic constitute the imposition of a penalty

or sanction that warrants mitigating effect under the purview of Gov.Bar R. V(13)(C)(6). And while we acknowledge that Carr submitted letters from 57 people attesting to her good character and reputation, those letters were procured with a false narrative in which Carr characterized her blatant and intentional misconduct as a series of inadvertent mistakes. The remaining mitigating factors are simply insufficient to overcome the sheer volume of Carr's misconduct, including her disregard for the rule of law, and the harm that her misconduct caused to the litigants in her courtroom and the honor and dignity of the judiciary.

{¶ 97} Carr's unprecedented misconduct involved more than 100 stipulated incidents that occurred over a period of approximately two years and encompassed repeated acts of dishonesty; the blatant and systematic disregard of due process, the law, court orders, and local rules; the disrespectful treatment of court staff and litigants; and the abuse of capias warrants and the court's contempt power. That misconduct warrants an indefinite suspension from the practice of law.

### III. CONCLUSION

{¶ 98} Accordingly, Pinkey Suzanne Carr is indefinitely suspended from the practice of law in Ohio. Pursuant to Gov.Jud.R. III(7)(A), she is immediately suspended from judicial office without pay for the duration of her disciplinary suspension. In addition to the requirements of Gov.Bar R. V(25), Carr's reinstatement shall be conditioned on her submission of (1) a report from a qualified healthcare professional stating that she is able to return to the competent, ethical, and professional practice of law and (2) proof of compliance with her October 30, 2021 OLAP contract and any amendment or extension thereof. Costs are taxed to Carr.

Judgment accordingly.

O'CONNOR, C.J., and FISCHER, MYERS, SADLER, and BRUNNER, JJ., concur.

KENNEDY, J., concurs in part and dissents in part, with an opinion joined by DEWINE, J.

BETH A. MYERS, J., of the First District Court of Appeals, sitting for DONNELLY, J.

LISA L. SADLER, J., of the Tenth District Court of Appeals, sitting for STEWART, J.

_____

**KENNEDY, J., concurring in part and dissenting in part.**

{¶ 99} I agree with the majority's determination that respondent, Pinkey Suzanne Carr, committed professional misconduct as found by the Board of Professional Conduct. But because the board's recommended sanction of a two-year suspension from the practice of law would remove Carr from serving as a member of the judiciary, in my view, that sanction would protect the public from future misconduct. I disagree with the majority's decision to increase the sanction and impose an indefinite suspension. I therefore dissent from the sanction imposed by the majority.

{¶ 100} The focus of our judicial-discipline system is not punishing the offender. *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. Rather, "[t]he primary purpose of judicial discipline is to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of [the judiciary]." *Id.* at ¶ 33. And the public would be protected if we imposed the board's recommended sanction of a two-year suspension in this case.

{¶ 101} Under R.C. 1901.10(B), "[a] vacancy in the office of [municipal court] judge exists upon the [judge's] * * * absence from official duties for a period of six consecutive months." A term suspension of more than six months, then, would cause Carr to be removed from judicial office. That consequence of Carr's misconduct, by itself, would protect the public from future misconduct, because Carr cannot abuse judicial power if she no longer holds judicial office. *See Disciplinary Counsel v. Burge*, 157 Ohio St.3d 203, 2019-Ohio-3205, 134 N.E.3d

153, ¶ 32 ("All of Burge's misconduct occurred during his time as a judge and was related to his judicial duties and responsibilities; since he resigned from the common pleas court following his criminal convictions, his misconduct is unlikely to recur"). It would also assure the evenhanded administration of justice and foster public confidence in the judiciary.

{¶ 102} Importantly, because Carr was a full-time judge at the time of her misconduct, none of her misconduct involved the handling of client matters. Yet the majority's decision to indefinitely suspend Carr may result in her inability to practice law even after she completes two years of that suspension. Readmission following an indefinite suspension is not automatic. *Compare* Gov.Bar R. V(24)(C) *with* Gov.Bar R. V(25)(D)(1). In addition to having to wait two years before applying for readmission to the practice of law, Gov.Bar R. V(25)(A)(1), an indefinitely suspended attorney must demonstrate by clear and convincing evidence that he or she possesses all the mental, educational, and moral qualifications required of an attorney and that he or she is now a proper person to be readmitted to the practice of law in Ohio, notwithstanding the previous disciplinary action, Gov.Bar R. V(25)(B)(5). Carr's misconduct in this case—i.e., engaging in improper plea bargaining and issuing arbitrary dispositions, improperly using capias warrants and bonds to compel the payment of fines, falsifying entries, lacking proper courtroom decorum—does not demonstrate that she is incapable of the competent and professional practice of law. During her indefinite suspension, then, Carr will not only have lost her judicial office, but she may also lose the privilege to practice law as an attorney if a future majority of this court denies her readmission. Our primary purpose in judicial-discipline cases is to protect the public—and because Carr would be removed from judicial office by imposition of a two-year suspension, imposing a greater sanction appears punitive.

{¶ 103} The majority examines four cases that the board relied on involving "misconduct bearing some resemblance to Carr's." Majority opinion, ¶ 87. In each

of these cases, this court imposed term suspensions; in none of them did we remove the disciplined judicial officer from the practice of law for more than a year. *See Disciplinary Counsel v. Medley*, 104 Ohio St.3d 251, 2004-Ohio-6402, 819 N.E.2d 273, ¶ 43 (18-month suspension with six months conditionally stayed); *Disciplinary Counsel v. Parker*, 116 Ohio St.3d 64, 2007-Ohio-5635, 876 N.E.2d 556, ¶ 130 (18-month suspension with six months conditionally stayed); *Disciplinary Counsel v. Bachman*, 163 Ohio St.3d 195, 2020-Ohio-6732, 168 N.E.3d 1178, ¶ 36-37 (six-month suspension); *Disciplinary Counsel v. Repp*, 165 Ohio St.3d 582, 2021-Ohio-3923, 180 N.E.3d 1128, ¶ 33 (one-year suspension). In distinguishing these cases, the majority concludes that Carr's misconduct warrants a sanction greater than an actual suspension for one year, but it fails to muster any caselaw supporting its position that an indefinite suspension is the appropriate sanction.

**{¶ 104}** "When imposing sanctions for judicial misconduct, we consider," among other things, "the sanctions imposed in similar cases." *Disciplinary Counsel v. Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, ¶ 14. A review of our caselaw reveals that when this court has indefinitely suspended judicial officers for misconduct, the judicial officer faced allegations of criminal conduct. *See Disciplinary Counsel v. Kelly*, 121 Ohio St.3d 39, 2009-Ohio-317, 901 N.E.2d 798, ¶ 1 (indefinitely suspending magistrate who embezzled funds from a county agency); *Disciplinary Counsel v. McAuliffe*, 121 Ohio St.3d 315, 2009-Ohio-1151, 903 N.E.2d 1209, ¶ 1-2, 30 (indefinitely suspending judge convicted of arson, fraud, and conspiracy); *Ohio State Bar Assn. v. McCafferty*, 140 Ohio St.3d 229, 2014-Ohio-3075, 17 N.E.3d 521, ¶ 2, 26 (indefinitely suspending judge convicted of multiple counts of lying to the FBI during corruption investigation); *Ohio State Bar Assn. v. Mason*, 152 Ohio St.3d 228, 2017-Ohio-9215, 94 N.E.3d 556, ¶ 1-3 (indefinitely suspending judge convicted of felonious assault and domestic violence); *Disciplinary Counsel v. Horton*, 158 Ohio St.3d 76, 2019-Ohio-4139,

140 N.E.3d 561, ¶ 1, 3, 79 (indefinitely suspending judge who sexually harassed staff, misused county resources for his judicial campaign, and was convicted of failing to file an accurate campaign statement).

{¶ 105} I agree with the majority that Carr's misconduct is more serious than the misconduct that occurred in *Medley*, *Parker*, *Repp*, and *Bachman* and that it warrants a greater sanction than was imposed in those cases. But Carr did not commit misconduct leading to a criminal conviction, as was the case when we have indefinitely suspended judicial officers. In my view, imposing an actual suspension from the practice of law for two years would be sufficient to protect the public from future misconduct. I therefore dissent from the majority's decision to impose an indefinite suspension.

DEWINE, J., concurs in the foregoing opinion.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Michelle A. Hall, Assistant Disciplinary Counsel, for relator.

Koblentz & Penvose, L.L.C., Richard S. Koblentz, Nicholas E. Froning, and Bryan L. Penvose, for respondent.

_____