**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Kegley*, **Slip Opinion No. 2025-Ohio-910.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-910

DISCIPLINARY COUNSEL *v.* KEGLEY.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Kegley*, Slip Opinion No. 2025-Ohio-910.]**

*Judges—Misconduct—Violations of the Code of Judicial Conduct—Conditionally stayed six-month suspension.*

(No. 2024-1721—Submitted January 7, 2025—Decided March 20, 2025.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-014.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ.  BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Russell Dee Kegley, of Portsmouth, Ohio, Attorney Registration No. 0002259, was admitted to the practice of law in Ohio in 1982. He has been a judge of the Portsmouth Municipal Court since January 2003.

{¶ 2} In a June 2024 complaint, relator, disciplinary counsel, alleged that Kegley committed four ethical violations by acting to secure his son's release from law-enforcement custody before his son's initial court appearance on charges of domestic violence and resisting arrest. The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors and submitted 26 stipulated exhibits. They also recommended that Kegley be publicly reprimanded for his misconduct.

{¶ 3} Kegley was the sole witness to testify at a hearing before a three-member panel of the Board of Professional Conduct. After the hearing, the panel issued a report finding that Kegley committed the charged misconduct and recommending that he be sanctioned with a public reprimand. With the exception of one mitigating factor, the board adopted the panel's findings of fact, conclusions of law, and recommended sanction. The parties jointly waived any objections to the board's report and recommendation.

{¶ 4} After independently reviewing the board's report and recommendation, the record, and our applicable precedent, we conclude that Kegley's misconduct warrants a sanction more severe than the public reprimand recommended by the board. For the reasons that follow, we suspend Kegley from the practice of law in Ohio for six months fully stayed on the condition that he engage in no further misconduct.

## MISCONDUCT

{¶ 5} At all times relevant to this proceeding, Kegley's son, Case Kegley, was married to E.K., who was employed as a secretary at the Scioto County Prosecutor's Office.

**{¶ 6}** The stipulated evidence shows that on May 25, 2023, at approximately 11:00 p.m., Case was arrested at the Portsmouth home he shared with E.K. He was charged with domestic violence, a first-degree misdemeanor, and resisting arrest, a second-degree misdemeanor. *See State v. Kegley*, Portsmouth M.C. No. 23 CRB000650.

**{¶ 7}** Case had allegedly struck E.K. several times, causing swelling to her face, along with a bloody nose and lip. After assessing the situation, the law-enforcement officers who responded to the scene were unable to control Case, who appeared to be intoxicated. They stunned him with a taser three times before they could restrain him for transport to the Scioto County Jail, where he was booked on the above charges.

**{¶ 8}** Case was scheduled to appear the next morning at 9:00 before Judge Steven L. Mowery, the only other judge of the Portsmouth Municipal Court. Under the bond schedule adopted by Judges Kegley and Mowery, the Scioto County Sheriff was required to hold all defendants charged with domestic violence without bond until their initial appearance before a judge or magistrate. Moreover, it was standard procedure in domestic-violence cases for the arraigning judge or magistrate in the Portsmouth Municipal Court to issue a temporary protection order to preclude a defendant from returning to the home where the victim was residing.

**{¶ 9}** After Case was booked into the jail, he called Kegley several times; Kegley was asleep and did not answer the phone. However, at approximately 1:05 a.m., about two hours after Case's arrest, Kegley called the jail, identifying himself as "Judge Kegley" and asking to speak with Case. A corrections officer answered the call and permitted Kegley to speak with his son. During that conversation, Case told Kegley his version of the events leading to his arrest, claiming among other things that E.K. had "started hittin' on" him and that he had never obstructed the police.

{¶ 10} When Kegley learned that Case had been charged with domestic violence and resisting arrest, he said, "Let me talk to the officer." Case handed the phone to the corrections officer, who confirmed the charges. At that point, Kegley stated, "Okay. Let him sign his bond. He'll be there tomorrow morning." Uncomfortable with Kegley's order and recognizing that it was contrary to the bond schedule that the court had adopted, the officer stated, "Okay. Uh, you mind if I try and get ahold of somebody real quick?" Kegley asked, "Who?" After the officer indicated his supervisor, Kegley responded, "Yeah. Yeah."

{¶ 11} The corrections officer contacted his supervisor, Sergeant Keri Kelley, at her home, and apprised her of the situation. Sergeant Kelley told the officer to obey Kegley's order even though it was contrary to the bond schedule. She also instructed the officer not to release Case before he became sober unless someone picked him up from the jail. The officer relayed that information to Kegley, who responded, "Absolutely. Do that. I'm not coming to pick him up." A few hours later, Case was released on his own recognizance. No one notified E.K. of Case's release.

{¶ 12} Following his release, Case returned to his home, where E.K. was present. Upon learning of Case's release, the office administrator for the Scioto County Prosecutor's Office requested that the Portsmouth Police Chief, Debra Brewer, conduct a welfare check on E.K., who had not appeared for work that morning. Chief Brewer immediately dispatched officers to the home and then went to Judge Mowery's courtroom, where she learned that Case had not appeared for his 9:00 a.m. arraignment. At Chief Brewer's request, Judge Mowery issued a warrant for Case's arrest.

{¶ 13} A police officer responded to E.K. and Case's home and found E.K. sitting on the front porch. E.K. told the officer that she was fine, and when asked, she informed the officer that Case was inside the house. Knowing that Case was inside and had been released from jail on a domestic-violence charge earlier that

4

day, the officer sought direction from his supervisor as two additional officers arrived on the scene. E.K., who had gone into the house, returned and informed the officers that Case was no longer inside. When asked how that was possible, E.K. stated that he had left through a back door. But when the officer checked the house, he discovered that there was no back door. After the officers informed E.K. that she could be charged with obstruction of justice if Case was in the house, she admitted that he was still there. Meanwhile, Chief Brewer advised all officers to remain on the scene until she arrived with the warrant for Case's arrest. Recognizing the potential volatility of the situation, the police requested assistance from a SWAT unit.

{¶ 14} At some point, Case called Kegley from inside the home and told him that the police were outside. After encouraging Case to surrender, Kegley drove to the scene.

{¶ 15} When Chief Brewer arrived, the police officers entered the home and arrested Case without deploying the SWAT team, which had remained on the scene. By the time Kegley arrived, Case had been arrested and placed in the back of a police cruiser.

{¶ 16} The police transported Case to the Scioto County Jail and charged him with failure to appear, a first-degree misdemeanor. *See State v. Kegley*, Portsmouth M.C. No. 23CRB00067. His arraignment was scheduled for four days later, Tuesday, May 30. After leaving the scene, Kegley went to the jail to speak with Case. When he was informed that a sheriff's-office policy prohibited family contact with an inmate during the booking process, Kegley stated that he understood. After leaving the jail, Kegley spoke with Judge Mowery to discuss the particulars of when Case would appear in court.

{¶ 17} Shortly thereafter, Case called Kegley again to request his assistance in securing Case's release from jail. During that call, Kegley told Case, "I probably overstepped my bounds letting you sign a bond last night." Later in the call, Case

again asked Kegley to get him out of jail; Kegley refused, stating, "Well, I can't get you out . . . I already overstepped my boundaries last night. I'm not supposed to have anything to do with your cases." (Ellipsis in original.) He also told Case, "You . . . probably don't have a bond because I talked to Judge Mowery and he said you're showing up Tuesday and you're gonna get your bond Tuesday. My guess is he told them to hold you because you didn't show up."

{¶ 18} On Tuesday, May 30, Case appeared for arraignment before Judge Mowery on the original domestic-violence case and the second case arising from his failure to appear. Judge Mowery set a $1,000 recognizance bond and issued a temporary protection order in favor of E.K. before recusing himself from Case's pending matters.

{¶ 19} On September 28, 2023, Case pleaded guilty to amended charges of disorderly conduct and attempted resisting arrest—misdemeanors of the fourth and third degree, respectively—and the charge of failure to appear was dismissed. Case was sentenced to 60 days in jail, suspended, and six months of probation.

{¶ 20} The parties stipulated and the board found that Kegley's interference in his son's case violated Jud.Cond.R. 1.2 (requiring a judge act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary), 1.3 (prohibiting a judge from abusing the prestige of judicial office to advance the personal or economic interests of the judge or others), 2.4(B) (prohibiting a judge from permitting family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment), and 2.9(A) (generally prohibiting a judge from initiating, receiving, permitting, or considering ex parte communications).

{¶ 21} The board explained that Kegley's contact with jail personnel constituted an impermissible ex parte communication in violation of Jud.Cond.R. 2.9(A). But it declined to find that Kegley's later conversation with Judge Mowery, which did not touch on any of the substantive issues in the case, constituted an

improper ex parte communication. Instead, the board concluded that that conversation fell within an exception to Jud.Cond.R. 2.9(A)'s general prohibition against ex parte communications. *See* Jud.Cond.R. 2.9(A)(1) ("When circumstances require it, an ex parte communication for scheduling, administrative, or emergency purposes, that does not address substantive matters or issues on the merits, is permitted, provided the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication.").

**{¶ 22}** We adopt the board's findings of fact and misconduct.

### RECOMMENDED SANCTION

**{¶ 23}** When imposing sanctions for judicial misconduct, we consider all relevant factors, including the ethical duties that the judge violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 24}** The parties stipulated that two aggravating factors are present in this case. Specifically, they agreed that Kegley had committed multiple offenses and caused harm to a vulnerable victim. *See* Gov.Bar R. V(13)(B)(4) and (8). The panel and board accepted the parties' stipulation that E.K. had been a vulnerable victim and faced significant harm when Case, after being charged with domestic violence against her, was released from jail and immediately returned to their home.

**{¶ 25}** Although the board acknowledged that Kegley violated multiple ethical rules, it concluded that those violations arose from a single act or incident of misconduct in that his misconduct "stem[med] primarily from [his] telephone conversation with the jail wherein he released his son on a personal bond." The board therefore rejected the parties' stipulation that Kegley had committed multiple offenses. *See Disciplinary Counsel v. Gaul*, 2010-Ohio-4831, ¶ 75-77 (making no finding of multiple offenses and concluding that the respondent-judge's

misconduct, which occurred on two consecutive days in a single criminal trial, was "isolated").

**{¶ 26}** As for mitigating factors, the parties stipulated and the panel and board found that Kegley had had a clean disciplinary record, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and presented evidence of his good character and reputation. *See* Gov.Bar R. V(13)(1), (4), and (5).

**{¶ 27}** The panel expressly found that Kegley's misconduct "was directed at helping his son who had just been arrested for domestic violence and thus, was unable to secure a bond." However, the panel concluded that Kegley "did not engage in any dishonest act nor did he proceed to help his son for personal gain or with a selfish motive." The panel therefore attributed mitigating effect to the absence of a dishonest or selfish motive in this case. *See* Gov.Bar R. V(13)(C)(2). The board rejected that finding without explanation.

**{¶ 28}** In determining the appropriate sanction to recommend for Kegley's misconduct, the board considered nine cases in which we imposed sanctions ranging from public reprimands to six-month suspensions for similar acts of judicial misconduct.

**{¶ 29}** The board concluded that three of those cases involved judicial misconduct that was significantly more egregious than Kegley's misconduct in this case. *See Disciplinary Counsel v. Salerno*, 2019-Ohio-435 (imposing a conditionally stayed one-year suspension on a judge who reduced a criminal defendant's bond following defense counsel's ex parte communications with her bailiff); *Disciplinary Counsel v. Marshall*, 2019-Ohio-670 (imposing a six-month suspension on a judge who repeatedly and inappropriately injected himself into his daughter's juvenile speeding case and made disparaging remarks about the law-enforcement officer involved in the case); *Disciplinary Counsel v. Hale*, 2014-Ohio-5053 (imposing a six-month suspension on a judge who unilaterally

dismissed a speeding ticket for his personal attorney and falsely represented that the dismissal was made at the prosecutor's request).

{¶ 30} In four cases considered by the board—*Disciplinary Counsel v. Elum*, 2012-Ohio-4700; *Disciplinary Counsel v. Winters*, 2021-Ohio-2753; *Disciplinary Counsel v. Goulding*, 2020-Ohio-4588; and *Disciplinary Counsel v. Porzio*, 2020-Ohio-1569—we imposed conditionally stayed six-month suspensions on judges and a magistrate who, like Kegley, engaged in improper ex parte communications.

{¶ 31} In *Elum*, a municipal-court judge interceded in a matter that was within the province of the probation department and used vulgar and intemperate language while lecturing the probationer outside the presence of the probationer's counsel and the prosecutor. Elum also needlessly injected himself into an internal police-department investigation related to a case that was pending in his court and, in an open courtroom, suggested that the police department was engaging in a cover-up.

{¶ 32} In *Winters*, a common-pleas-court judge became Facebook "friends" with a man shortly after sentencing him on several criminal offenses and then engaged in inappropriate ex parte communications with him through Facebook for nearly five months. *Winters* at ¶ 7-8. The inappropriate communications related to four cases over which the judge was presiding and in which the friend had an interest—including the friend's pending child-custody case and a case involving civil stalking protection orders that had been issued against him.

{¶ 33} Like Kegley, Winters violated rules that required him to behave in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and that prohibited him from engaging ex parte communications. *See id.*, 2021-Ohio-2753, at ¶ 28. But unlike Kegley, Winters also violated a rule requiring him to promptly disclose the substance of those ex parte communications to other parties to the litigation, he failed to recuse himself

from three cases in which his impartiality might reasonably have been questioned, and he failed to uphold and apply the law and perform all of his judicial duties fairly and impartially. *See id.* at ¶ 28-30.

{¶ 34} Here, the parties agreed that the facts of this case most closely align with the facts of *Goulding*, 2020-Ohio-4588. At the request of his friends, Goulding, a common-pleas-court judge, interfered in a criminal case assigned to another judge of the same court. The defendant in that case was the boyfriend of the friends' daughter who was being held without bail pending arraignment following his indictment on three counts of illegal use of a minor in a nudity-oriented performance.

{¶ 35} Goulding called the county pretrial-services department to obtain information about the defendant's case, and the officer who answered knew that he was a common-pleas-court judge. Goulding ordered that the defendant be released on a recognizance bond with a no-contact order two days before his scheduled arraignment—even though he had been informed that the defendant was already on probation for an aggravated-menacing conviction. Goulding then spoke twice with the defendant before he was released from jail on Goulding's order. He sent messages to the defendant's attorney and the judge assigned to the case to let them know that he had ordered the defendant's release. But he did not inform the prosecutor of his actions, nor did he inform the attorneys that he had engaged in ex parte communications with the defendant.

{¶ 36} Goulding violated three of the four rules that Kegley violated. *See id.* at ¶ 18. But the parties to this case and the board emphasized that whereas Goulding attempted to downplay his misconduct and exhibited "an attitude of denial," *id.* at ¶ 22, Kegley quickly acknowledged his misconduct.

{¶ 37} Although the parties in this case agreed that *Goulding* is most analogous to this case, the board found *Porzio*, 2020-Ohio-1569, and two cases in which we publicly reprimanded judges who engaged in similar acts of

misconduct—*Disciplinary Counsel v. Medley*, 2001-Ohio-1592, and *Disciplinary Counsel v. Stuard*, 2009-Ohio-261—to be most instructive.

{¶ 38} Porzio, a magistrate, engaged in ex parte communications with a party to litigation over which she was presiding that gave the appearance of bias against the opposing party and created the appearance of impropriety, in violation of Jud.Cond.R. 2.9(A) and 1.2—two of the four violations at issue in Kegley's case. *See Porzio* at ¶ 9-10. Porzio also violated Jud.Cond.R. 2.11(A) (requiring a judge to disqualify himself or herself in any proceeding in which the judge's partiality might reasonably be questioned). *Id*. at ¶ 11. And a few months after Porzio engaged in improper ex parte communications, she granted a civil protection order to the party with whom she had improperly communicated and denied the excluded party's counterpetition. *Id*. at ¶ 7. We imposed a conditionally stayed six-month suspension for Porzio's misconduct. *Id*. at ¶ 20.

{¶ 39} In *Medley*, a municipal-court judge spoke by telephone with a woman who had recently been arrested on a DUI charge. The judge then picked the woman up from the police station and drove her home without discussing her case. He later accepted the woman's guilty plea in the resulting criminal case. Medley's conduct violated three canons of the former Code of Judicial Conduct, *see* 78 Ohio St.3d CLXIV, that required judges to (1) act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, (2) avoid impropriety and the appearance of impropriety in all activities, and (3) recuse themselves from a proceeding in which their impartiality might reasonably be questioned. *Id*. at ¶ 10. In the presence of six mitigating factors and no aggravating factors, we publicly reprimanded Medley. *Medley* at ¶ 13-15.

{¶ 40} Finally, in *Stuard*, 2009-Ohio-261, we publicly reprimanded a judge for engaging in several ex parte conversations with a prosecutor in a capital murder case. Stuard asked the prosecutor to prepare the court's sentencing opinion and gave him two pages of notes on the aggravating circumstances and mitigating

factors that he had weighed in deciding to sentence the defendant to death. He later reviewed the prosecutor's draft opinion and communicated with the prosecutor regarding proposed revisions without including defense counsel in any part of the process. In addition to finding that Stuard, like Kegley, engaged in prohibited ex parte communications and failed to act at all times in a manner that promotes public confidence in the integrity of the judiciary, we found that Stuard's conduct was prejudicial to the administration of justice. *See id.* at ¶ 10. In the presence of three mitigating factors and no aggravating factors, we publicly reprimanded Stuard for his misconduct. *Id.* at ¶ 13-14, 16.

{¶ 41} Relying primarily on *Porzio*, *Medley,* and *Stuard*, the board recommends that we publicly reprimand Kegley for his misconduct. The parties and the board maintain that Kegley "acknowledged almost immediately that he should not have interfered in his son's case" and that his misconduct was a "one-time mistake of poor judgment as opposed to the repeated ex parte contacts in *Goulding.*" While that may be true, the sanction proposed by the parties fails to account for Kegley's disregard of the personal safety of his daughter-in-law, who had been a victim of domestic violence.

{¶ 42} Based on the foregoing, we conclude that the public reprimand recommended by the board would not reflect the gravity of Kegley's misconduct in this case. Instead, we find that the facts of this case are most comparable to those of *Goulding* and that a conditionally stayed six-month suspension is the appropriate sanction for Kegley's misconduct.

## CONCLUSION

{¶ 43} Accordingly, Russell Dee Kegley is hereby suspended from the practice of law in Ohio for six months with the entire suspension stayed on the condition that he engage in no further misconduct. If Kegley fails to comply with the condition of the stay, the stay will be revoked and he will serve the entire six-month suspension. Costs are taxed to Kegley.

Judgment accordingly.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Cara L. Dawson, Assistant Disciplinary Counsel, for relator.

Charles J. Kettlewell, for respondent.

_____