**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Skelton*, **Slip Opinion No. 2026-Ohio-1991.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1991

DISCIPLINARY COUNSEL *v.* SKELTON.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Skelton*, Slip Opinion No. 2026-Ohio-1991.]**

*Judges—Misconduct—Violations of the Code of Judicial Conduct and the Rules of Professional Conduct, including ex parte communications, investigation of facts outside the record, abuse of prestige of judicial office by granting a motion for judicial release while disregarding the statutory requirements for such release, and refusal to self-report—One-year suspension with six months conditionally stayed.*

(No. 2025-1324—Submitted December 10, 2025—Decided June 2, 2026.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-021.

_____

The per curiam opinion below was joined by DEWINE, HESS, DETERS, HAWKINS, and SHANAHAN, JJ. FISCHER, J., concurred in part and dissented in part,

with an opinion joined by KENNEDY, C.J. MICHAEL D. HESS, J., of the Fourth District Court of Appeals, sat for BRUNNER, J.

**Per Curiam.**

{¶ 1} Respondent, Richard Steven Skelton, of Centerville, Ohio, Attorney Registration No. 0040694, was admitted to the practice of law in Ohio in 1988. Skelton served as a judge in the Montgomery County Court of Common Pleas from January 3, 2015, until he resigned on December 31, 2024.

{¶ 2} In a March 2025 amended complaint, relator, disciplinary counsel, alleged that while serving as a judge, Skelton violated six rules of the Code of Judicial Conduct and committed three violations of the Rules of Professional Conduct by, among other things, seeking the improper transfer of a criminal case from another judge to himself, engaging in multiple improper ex parte communications with the defendant in that case and the defendant's mother, facilitating the early release of the defendant from prison, and failing to self-report.

{¶ 3} The parties entered into stipulations of fact and misconduct. They also stipulated to aggravating and mitigating factors, submitted 49 stipulated exhibits, and jointly recommended that Skelton be suspended from the practice of law for one year with the entire suspension stayed on the condition that he engage in no further misconduct.

{¶ 4} Skelton was the sole witness to testify at a hearing before a three-member panel of the Board of Professional Conduct. After the hearing, the panel issued a report in which it found by clear and convincing evidence that Skelton committed the charged misconduct with the exception of one of the three alleged violations of the Rules of Professional Conduct, which the panel unanimously dismissed on the recommendation of the parties. The panel recommended that Skelton be suspended from the practice of law for one year with the entire suspension stayed on the condition that he engage in no further misconduct. The

board adopted the panel's findings of fact, conclusions of law, and recommended sanction. No objections have been filed.

{¶ 5} After independently reviewing the board's report and recommendation, the record, and our applicable precedent, we adopt the board's findings of misconduct. However, we find that the nature and scope of Skelton's misconduct requires a harsher sanction. For the reasons that follow, we suspend Skelton from the practice of law in Ohio for one year with six months stayed on the condition that he engage in no further misconduct.

## MISCONDUCT

{¶ 6} On August 11, 2020, Aaron Cox, pleaded guilty to the following crimes in the Montgomery County Court of Common Pleas: aggravated robbery, a first-degree felony; felonious assault, a first-degree felony; escape, a third-degree felony; and possession of a fentanyl-related compound, a fifth-degree felony. The aggravated-robbery charge arose from an August 2019 incident in which Cox robbed a person at knifepoint. *See State v. Cox*, 2022-Ohio-4623, ¶ 2 (2d Dist.). The felonious-assault and escape charges arose from a June 2020 incident that began when Cox showed a sheriff's deputy that he was not properly handcuffed while being transported from a hospital to the county jail. When the deputy stopped his cruiser to properly secure Cox, Cox pushed the deputy to the ground, jumped into the driver's seat of the cruiser, and drove over the deputy's arm while fleeing the scene. *See id.* at ¶ 3.

{¶ 7} On September 21, 2020, Judge Michael W. Krumholtz sentenced Cox to four to six years in prison for the aggravated-robbery conviction, four to six years for the felonious-assault conviction, 12 months for the escape conviction, and 12 months for the possession conviction. Judge Krumholtz ordered that the sentences be run concurrently to each other with the exception of the 12-month sentence for the escape conviction, which he ordered be run consecutively to the other sentences, resulting in an aggregate indefinite prison sentence of five to six years.

{¶ 8} Skelton was a patient in a medical practice that employed Cox's mother, Shelly Overton. As early as the day after Cox's sentencing hearing, Overton began communicating with Skelton by email, phone, and text message to discuss Cox's cases and the potential for his early release from prison.

{¶ 9} In late 2021, Judge Krumholtz announced his intention to retire from the bench, effective February 28, 2022. After learning of Judge Krumholtz's impending retirement, Overton spoke with Skelton during one of his medical appointments. At that time, Skelton told Overton that he would talk to Judge Krumholtz about taking over Cox's cases. Although Skelton spoke to Judge Krumholtz and his bailiff about transferring Cox's cases to Skelton's docket, Cox's cases were not transferred at that time.

{¶ 10} In January 2022, Cox filed a motion for judicial release, but Judge Krumholtz did not rule on the motion before retiring. Upon Judge Krumholtz's retirement, all of his cases were initially assigned to Judge Stephen Wolaver, a visiting judge. Judge Wolaver denied Cox's motion for judicial release on March 3. Following that ruling, Overton texted Skelton on his personal cellphone, providing a list of Cox's case numbers and informing him that she did not believe that Judge Wolaver's ruling was "with prejudice." Skelton did not respond to that message.

{¶ 11} On March 9, Overton texted Skelton again, asking whether he had received her earlier message. Skelton replied, stating that he had received it and that because Judge Wolaver's entry did not state whether the motion was denied with or without prejudice, it had to have been without prejudice. Skelton informed Overton that Cox would be able to "file again" and that he wanted to meet with her at her place of employment during a medical appointment scheduled for the following week. On March 11, they exchanged additional text messages and arranged to meet to discuss Cox's cases in Skelton's chambers instead of at his doctor's office. The following week, Overton sent Skelton a text to confirm that

he had received an email from her "with the requested information [he had] asked for concerning [her] son," but Skelton did not reply to the message.

{¶ 12} On April 8, Judge Kimberly Melnick was appointed to the bench as Judge Krumholtz's successor. Under former Montgomery C.P., Gen.Div., Loc.R. 1.19(F)(1) (now Loc.R. 5.06(A)), Cox's cases should have been assigned to Judge Melnick. Furthermore, Sup.R. 36.016(C) requires that any cases transferred from a judge's docket for administrative reasons be reassigned by lot. Before Judge Melnick's appointment, however, an order directing that Cox's cases be transferred to Skelton was submitted to Judge Timothy N. O'Connell, who at that time was the administrative judge of the Montgomery County Court of Common Pleas. Judge O'Connell signed the order on April 1. When testifying at his disciplinary hearing, Skelton denied that he was personally involved in the transfer of Cox's cases. Given the evidence in the record, the board was unable—and we are unable—to determine who submitted the transfer order to Judge O'Connell.

{¶ 13} In mid-April, Overton texted Skelton to request an update on Cox's cases. A few days later, Overton and Skelton exchanged multiple text messages and scheduled a time to talk by phone. On May 18, Cox filed a second motion for judicial release and Overton texted Skelton to alert him of the filing. Skelton replied, stating that he was aware of the filing and that he would let Overton know when he had scheduled a hearing on the motion. The next day, Overton texted Skelton to let him know that the motion was "the exact same" motion that had previously been denied by Judge Wolaver. Skelton replied, "[G]ot it covered." Later that day, Skelton issued a warrant for removal directing the Montgomery County Sheriff's Office to transport Cox from the Chillicothe Correctional Institution to his courtroom for a judicial-release hearing on June 9, 2022.

{¶ 14} On May 20, Skelton sent Overton the following text message:

[S]et the judicial release hearing for June 9—that is my criminal docket time, every [T]hursday. [H]e will be brought back a day or two prior. [I] probably will not do the hearing during my docket—will call u later and let u know my plan. [R]emember, do not tell him he is getting released! [T]alk soon, judge dick.

{¶ 15} Overton responded, "Perfect thank you!! I promise I will not tell him you are releasing him!! Like I said I can't thank you enough!!"

{¶ 16} Later that day, a manager in the Montgomery County Pretrial and Investigative Services Department contacted Skelton after seeing the warrant for removal. Skelton told the manager that he intended to grant Cox's motion for judicial release and that he did not need anything from the department. Later in May, Skelton ran into the assistant prosecutor assigned to Cox's cases. Skelton told her that he had taken over Cox's cases and that after speaking with Overton, he was thinking about releasing Cox early.

{¶ 17} Skelton and Overton resumed their text exchange in June 2022. On June 8, Skelton ordered Cox to his courtroom without inviting the prosecution or Cox's attorney. There, Skelton and Cox engaged in an ex parte conversation, during which Skelton questioned Cox about his drug use and told Cox that he intended to release him from prison with conditions. The assistant prosecutor learned of the meeting and filed a memorandum opposing judicial release later that day. On the same day, Cox and Overton spoke on a recorded jail phone line. Cox recounted his private meeting with Skelton, and Overton told Cox that she had known about his impending release for more than two weeks but kept it a secret on Skelton's instruction. Overton also told Cox that Skelton believed that Cox was "done with drugs."

{¶ 18} The version of R.C. 2929.20 in effect in June 2022 prohibited a court from granting a motion for judicial release for an eligible offender without

conducting a hearing on the motion. *See* former R.C. 2929.20(D), 2018 Am.Sub.S.B. No. 201. The statute also prohibited a court from granting judicial release to an eligible offender imprisoned for a first-degree felony without making certain findings on the record. *See* former R.C. 2929.20(J), 2018 Am.Sub.S.B. No. 201.

{¶ 19} On June 10, 2022, all the parties to Cox's cases were present in court. However, Skelton failed to conduct a hearing on Cox's motion for judicial release or make any findings on the record. Instead, he announced that he was granting the motion over the State's objection. During the proceeding, Skelton stated, "The matter is before the court pursuant to [a] request for judicial release. It was filed on behalf of the defendant. Report indicating he's eligible." However, the report prepared by the court's senior investigative probation officer stated that Cox was not eligible for judicial release and that he would not be eligible until he had served four years of his nonmandatory stated prison term. Skelton later executed and filed an affidavit stating that he had not received the report and that he mistakenly stated that he had reviewed it before granting Cox's motion.

{¶ 20} Shortly after granting Cox's motion for judicial release, Skelton exchanged a series of text messages with Overton. He informed Overton that he had granted Cox's motion and told her that he would "monitor [Cox] [him]self." Later that afternoon, Skelton personally escorted Cox out of the courthouse, where Overton and Cox's children were waiting for him. Over the next several weeks, Skelton and Overton exchanged several text messages, with Overton sharing family photos and updates about Cox's time at home.

{¶ 21} On July 6, the State appealed Skelton's judicial-release order to the Second District Court of Appeals, arguing that Cox was ineligible for judicial release and that Skelton had granted Cox's motion without first holding a hearing on it and making findings of fact, as required by former R.C. 2929.20(D) and (J), respectively. Upon learning of the circumstances surrounding the transfer of Cox's

cases to Skelton, Judge O'Connell randomly reassigned the cases to Judge Mary Montgomery. Thereafter, Judges O'Connell and Mary Wiseman spoke to Skelton about their concerns regarding his conduct. They encouraged Skelton to self-report his misconduct, but he refused to do so. Consequently, Judges Wiseman and O'Connell filed a grievance against Skelton with relator.

{¶ 22} In September 2022, while the State's appeal remained pending, the county probation department filed a notice of a probation-revocation hearing in which it alleged that Cox had failed to keep his probation officer apprised of his employment status, failed to abstain from the use of illicit drugs, and left the State without the permission of the court or the probation department. In October 2022, Judge Montgomery conducted a hearing at which she found that Cox had violated the terms of his judicial release and ordered him to be imprisoned for the remainder of his sentence. The court of appeals later dismissed the State's appeal as moot because Cox's judicial release had been revoked. *See Cox*, 2022-Ohio-4623, at ¶ 14-15 (2nd Dist.).

{¶ 23} The parties stipulated and the board found that Skelton's conduct violated Jud.Cond.R. 1.2 (requiring that a judge act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary), 1.3 (prohibiting a judge from abusing the prestige of judicial office to advance the personal or economic interests of the judge or others), 2.2 (requiring a judge to uphold and apply the law and to perform all duties of judicial office fairly and impartially), 2.9(A) (prohibiting a judge from initiating, receiving, permitting, or considering ex parte communications), 2.9(C) (prohibiting a judge from investigating facts in a matter independently and requiring a judge to consider only the evidence presented and any facts that may properly be judicially noticed), and 2.11(A) (requiring a judge to disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned).

**{¶ 24}** In addition, the parties stipulated and the board found that Skelton's conduct violated Prof.Cond.R. 8.3(b) (requiring a lawyer who possesses unprivileged knowledge that a judge has violated applicable rules of professional or judicial conduct to inform the appropriate authority) and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice). The parties stipulated to the dismissal of an alleged violation of Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). Finding that there was no clear and convincing evidence indicating that Skelton had engaged in such conduct, the panel unanimously dismissed the alleged violation of that rule.

**{¶ 25}** Clear and convincing evidence shows that Skelton engaged in brazen and persistent ex parte communications with Overton and Cox about Cox's criminal cases, in violation of Jud.Cond.R. 2.9(A). Skelton violated Jud.Cond.R. 2.9(C) by using those communications to further his own private investigation, gathering information outside the record to help Overton secure her son's judicial release.

**{¶ 26}** Skelton not only failed to recuse himself from Cox's cases, in violation of Jud.Cond.R. 2.11(A), but also disregarded the procedures for the random assignment of judges in multijudge courts established by the Rules of Superintendence for the Courts of Ohio, *see* Sup.R. 36.011(A) and (C)(2)(c) (requiring each multijudge court to adopt the individual assignment system in which the judicial assignment of all cases is random). "The purpose of random assignment or reassignment of cases is not only to avoid judge-shopping and to distribute cases equitably among judges, *see* Sup.R. 36.011 commentary, but also to maintain public confidence in the judicial system by ensuring that cases are assigned impartially and not deliberately to a certain judge." *In re Disqualification of Celebrezze*, 2023-Ohio-4383, ¶ 99. Those procedures "'promot[e] fairness and impartiality and . . . reduc[e] the dangers of favoritism and bias.'" *Id.*, quoting *United States v. Phillips*, 59 F.Supp.2d 1178, 1180 (D.Utah 1999).

**{¶ 27}** Shortly before Judge Krumholtz's retirement, despite the rules requiring the random assignment of cases, Skelton sought to have Cox's cases—in which he had a personal bias and personal knowledge of facts that were in dispute—assigned to himself. Then, Skelton violated Jud.Cond.R. 2.2 by failing to perform the duties of his office fairly and impartially and violated Jud.Cond.R. 1.3 by abusing the prestige of his judicial office to advance Overton's interests and grant Cox's motion for judicial release without determining his eligibility for such release, conducting a statutorily required hearing, or making statutorily required findings.

**{¶ 28}** Clear and convincing evidence supports the board's finding that Skelton violated Prof.Cond.R. 8.3(b) by "fail[ing] to report the litany of violations" discussed above, "even after being confronted by his fellow judges." Although Skelton testified that the concerns Judges Wiseman and O'Connell raised with him involved only Skelton's manipulation of the process used to randomly reassign cases, the board found that "it is plain from the grievance filed by Judges Wiseman and O'Connell that the basis [for the confrontation] also rested squarely on the *ex parte* communication issue." Finding that "a Prof.Cond.R. 8.3(b) violation does not turn on whether [Skelton] was asked to self-report and did not," the board concluded that Skelton's awareness of his regular and frequent ex parte communications with Overton and Cox was enough to support a finding that Skelton violated Prof.Cond.R. 8.3(b).

**{¶ 29}** Lastly, the board found that Skelton's engaging in multiple ex parte communications, investigating facts outside the record, and abusing the prestige of his office to advance Cox's interests—which we note resulted in the judicial release of an ineligible offender—have prejudiced the administration of justice, in violation of Prof.Cond.R. 8.4(d).

**{¶ 30}** We adopt the board's findings of misconduct.

**RECOMMENDED SANCTION**

{¶ 31} When imposing sanctions for judicial misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 32} The parties stipulated and the board found that two aggravating factors are present in this case: Skelton engaged in a pattern of misconduct and committed multiple offenses. *See* Gov.Bar R. V(13)(B)(3) and (4). His blatant and persistent ex parte communications over nearly two years and his expansive pattern of misconduct violated multiple rules of judicial and professional conduct.

{¶ 33} As for mitigating factors, the parties stipulated and the board found that Skelton had had a clean disciplinary record, had not acted with a dishonest or selfish motive, had made full and free disclosure to the board or exhibited a cooperative attitude toward the disciplinary proceedings, and had submitted evidence of his good character or reputation. *See* Gov.Bar R. V(13)(C)(1), (2), (4), and (5). The board also "t[ook] notice" that Skelton is no longer on the bench, having resigned prior to his disciplinary hearing, about three years before the expiration of his term. *See* Gov.Bar R. V(13)(C)(9).

{¶ 34} "We hold judges to the highest standards of professional behavior because they are invested with the public trust." *Disciplinary Counsel v. Carr*, 2022-Ohio-3633, ¶ 86, citing *Disciplinary Counsel v. O'Neill*, 2004-Ohio-4704, ¶ 57. "The primary purpose of judicial discipline is to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of [the judiciary]." *O'Neill* at ¶ 33.

{¶ 35} In deciding the appropriate sanction to recommend for Skelton's misconduct, the board found *Disciplinary Counsel v. Kegley*, 2025-Ohio-910, and *Disciplinary Counsel v. Winters*, 2021-Ohio-2753 to be instructive.

{¶ 36} In *Kegley*, a municipal-court judge violated four judicial-conduct rules by acting to secure his son's release from law-enforcement custody before his son's initial court appearance on charges of domestic violence and resisting arrest. *Kegley* at ¶ 20-21. Specifically, after Kegley's son called him from jail, Kegley contacted the jail, identified himself as "Judge Kegley," and asked to speak with his son. *Id.* at ¶ 9. After speaking with his son, Kegley engaged in an ex parte communication with the corrections officer who had answered the call and instructed the officer to release him. *Id.* at ¶ 10-11. Kegley's order violated the bond schedule that he himself had adopted, which required that defendants charged with domestic violence be held without bond until their initial appearance in court. *Id*. at ¶ 11. It also violated the court's standard operating procedure of issuing a temporary protection order to preclude a defendant charged with domestic violence from returning to the victim's residence. *Id*. at ¶ 8.

{¶ 37} Following his release, Kegley's son returned home, where his wife, the victim of his offense, was present. He failed to appear for his arraignment the following morning and was arrested at his home later that day. *Id*. at ¶ 12-15. At that point, recognizing that he had "'overstepped his bounds,'" Kegley refused to afford his son any further assistance. *Id*. at ¶ 17.

{¶ 38} We found that Kegley committed a single incident of misconduct that violated three of the eight ethics rules at issue in this case—namely, Jud.Cond.R. 1.2, 1.3, and 2.9(A)—and that he also violated Jud.Cond.R. 2.9(B) (requiring a judge who receives an unauthorized ex parte communication bearing on the substance of a matter to promptly notify the parties of the substance of the communication and provide them with an opportunity to respond). *See id*. at ¶ 21-22, 25. The only aggravating factor was the harm Kegley's conduct had caused to a vulnerable victim—namely, his son's wife. *Id*. at ¶ 24-25. Mitigating factors consisted of Kegley's clean disciplinary record, his full and free disclosure to the board and cooperative attitude toward the proceedings, and his submission of

evidence of his good character. *Id*. at ¶ 26. We suspended Kegley from the practice of law for six months with the entire suspension stayed on the condition that he engage in no further misconduct. *Id*. at ¶ 43.

{¶ 39} *Winters*, 2021-Ohio-2753, also involved misconduct similar to Skelton's. Shortly after Winters, a common-pleas-court judge, sentenced a man for several criminal convictions, the judge became Facebook "friends" with him. Over the next five months, Winters engaged in inappropriate ex parte communications with the man regarding multiple other cases over which Winters was presiding and in which the man either was a party or otherwise had an interest. We found that Winters committed four violations each of Jud.Cond.R. 1.2, 2.9(A), and 2.9(B). *Id.* at ¶ 28. We also found that he committed three violations of Jud.Cond.R. 2.11(A) and one violation of Jud.Cond.R. 2.2. *Id.* at ¶ 29-30.

{¶ 40} Although Winters committed 16 rule violations—compared to the eight rule violations at issue in this case—he was not found to have either abused the prestige of his judicial office, to have conducted an independent investigation of cases pending before him, or to have engaged in conduct prejudicial to the administration of justice, as Skelton has been here. The aggravating and mitigating factors present in *Winters* are very similar to those present in this case, except that Winters also expressed genuine remorse for his misconduct and terminated his social-media accounts—though he did not resign his judicial position, as Skelton has. *See id.* at ¶ 32. We suspended Winters from the practice of law for six months with the entire suspension stayed on the conditions that he complete three hours of judicial-ethics education, engage in no further misconduct, and pay the costs of his disciplinary proceedings. *Id*. at ¶ 40.

{¶ 41} The board found that Skelton's misconduct is more serious than Winters's and Kegley's and that Skelton therefore deserves a longer suspension. The board also found, however, that Skelton's misconduct was tempered by the mitigating factors identified above, and it noted that his resignation from the bench

made it unlikely that his misconduct would be repeated. The board therefore recommends that Skelton be suspended from the practice of law for one year with the entire suspension stayed on the condition that he commit no further misconduct.

{¶ 42} While *Kegley* and *Winters* involved *some* of the same violations that are at issue in this case, we find that neither of those cases encompasses the full measure of Skelton's misconduct. In addition to engaging in improper ex parte communications for nearly two years, Skelton engaged in conduct that was prejudicial to the administration of justice—due in part to his deliberate efforts to evade the random assignment of cases to achieve a goal that was contrary to law. On those issues, we find our decisions in *Disciplinary Counsel v. Hale*, 2014-Ohio-5053, *Disciplinary Counsel v. Marshall*, 2019-Ohio-670, and *Disciplinary Counsel v. Celebrezze*, 2026-Ohio-45, to be instructive.

{¶ 43} Hale engaged in dishonest conduct while serving in a rotation as a municipal court's duty judge. He unilaterally dismissed a speeding ticket for his personal attorney in a journal entry that falsely stated that the dismissal was at the prosecutor's request. *Hale* at ¶ 10-13. After the media discovered the dismissal, Hale created a second false entry and engaged in ex parte communications in an effort to conceal his misdeeds. *Id.* at ¶ 26. In addition, Hale gave false testimony during his disciplinary hearing. *Id*. at ¶ 28. Hale's conduct violated four of the six judicial-conduct rules at issue in this case—Jud.Cond.R. 1.2, 1.3, 2.2, and 2.9—and like Skelton, Hale engaged in conduct that was prejudicial to the administration of justice, in violation of Prof.Cond.R. 8.4(d). *See id.* at ¶ 17. In contrast to Skelton, Hale was also found to have engaged in dishonesty and conduct that adversely reflected on his fitness to practice law, in violation of Prof.Cond.R. 8.4(c) and 8.4(h). *See id*. at ¶ 17, 27.

{¶ 44} Two aggravating factors were present in *Hale*: he acted with a dishonest or selfish motive and gave false and misleading testimony about his practice of law following his resignation from the bench. *Id*. at ¶ 29. Hale, like

Skelton, had a lengthy, otherwise unblemished career, made full and free disclosure of his misconduct and exhibited a cooperative attitude toward the disciplinary proceedings, enjoyed a good reputation in his community, and took responsibility for his actions by resigning from the bench. *See id.* at ¶ 30, 39. We also attributed mitigating effect to the facts that Hale's misconduct was limited to a single case to which he had a personal connection, justice was ultimately served in that matter, and no litigants had suffered permanent harm as a result of his misconduct. *Id.* at ¶ 39. Under those circumstances, we suspended Hale for six months with no stay. *Id.* at ¶ 38-40.

{¶ 45} In *Marshall*, we imposed the same sanction on a common-pleas-court judge who repeatedly and inappropriately injected himself into his daughter's juvenile speeding case and made disparaging remarks about the state trooper involved in the case. 2019-Ohio-670 at ¶ 6-13, 19-21, 34. Marshall also allowed his personal animosity to affect his treatment of an assistant prosecuting attorney and another trooper when they appeared in his courtroom in unrelated cases. *Id.* at ¶ 6-16. Marshall's daughter's case went to trial, which Marshall attended and twice interrupted with inappropriate outbursts. *Id.* at ¶ 20.

{¶ 46} Marshall's conduct violated five of the eight ethics rules at issue in this case—Jud.Cond.R. 1.2, 1.3, 2.2, and 2.9(A) and Prof.Cond.R. 8.4(d)—and also violated Jud.Cond.R. 2.3(A) (requiring a judge to perform the duties of judicial office without bias or prejudice). *Id.* at ¶ 26. Aggravating factors consisted of Marshall's prior discipline, which arose from his conviction for operating a motor vehicle while intoxicated, and his multiple offenses. *Id.* at ¶ 2, 28. As for mitigation, Marshall exhibited a cooperative attitude toward the disciplinary proceedings, presented evidence of his good character and community involvement, and resigned from his judicial position after acknowledging that his conduct in his daughter's case was inappropriate. *Id.* at ¶ 28.

**{¶ 47}** More recently, in *Celebrezze*, we recognized that "'attempts to manipulate the random case assignment process are subject to universal condemnation' in part because of the 'role that random assignment procedures play in promoting fairness and impartiality and in reducing the dangers of favoritism and bias.'" 2026-Ohio-45 at ¶ 53, quoting *Phillips*, 59 F.Supp.2d at 1180. Celebrezze, a domestic-relations judge, violated superintendence rules and local court rules requiring the random assignment of cases as Skelton did in this case, but she did so on multiple occasions. *See, e.g.*, Sup.R. 36.019(A) (requiring the random reassignment of a case following recusal of a judge. Celebrezze reassigned two divorce cases to herself, *id.* at ¶ 14, 22, and abused her position as the court's administrative judge by asking colleagues to transfer other divorce cases directly to her, in violation of the rules, *id.* at ¶ 9, 21.

**{¶ 48}** In addition, for nearly two years, Celebrezze often appointed or recommended the appointment of her long-term friend and love interest as a receiver or mediator in pending cases without disclosing that personal relationship to the parties. *Id.* at ¶ 3. In one instance, she authorized or approved the payment of almost $242,000 in receiver fees to her friend and nearly $172,000 in legal fees to his counsel. *Id.* at ¶ 11. During the investigatory phase of the resulting disciplinary proceeding, Celebrezze made false statements about her relationship with her friend. *Id.* at ¶ 24. Celebrezze resigned from the bench while her disciplinary case was pending before this court. *Id*. at ¶ 1.

**{¶ 49}** We found that Celebrezze committed 15 ethical violations involving four of the eight rules that Skelton violated in this case—namely, Jud.Cond.R. 1.2, 2.9(A), and 2.9(C) and Prof.Cond.R. 8.4(d). *See id.* at ¶ 28-29. But Celebrezze committed three violations each of Jud.Cond.R. 1.2 and 2.11(A) and Prof.Cond.R. 8.4(d) and a single violation of Jud.Cond.R. 2.9(A). *Id.* at ¶ 29. She also committed three violations of Jud.Cond.R. 2.5 (requiring a judge to perform judicial and administrative duties competently and diligently and to comply with guidelines set

forth in the Superintendence Rules) and single violations of Prof.Cond.R. 8.1(a) and 8.4(c). *Id*. at ¶ 29.

**{¶ 50}** Four aggravating factors were present in *Celebrezze*, compared to just two in this case. Specifically, Celebrezze acted with a dishonest or selfish motive, engaged in a pattern of misconduct that involved multiple cases, committed multiple offenses, and submitted false statements during the disciplinary investigation. *Id*., 2026-Ohio-45, at ¶ 32. Mitigating factors consisted of Celebrezze's clean disciplinary record, evidence of her good character or reputation, and her cooperative attitude toward the disciplinary proceedings, *id.* at ¶ 33—whereas Skelton's case includes the additional mitigating factor of the absence of a dishonest or selfish motive.

**{¶ 51}** We found that Celebrezze's misconduct had caused "'incalculable harm to the public perception of the legal system.'" *Id.* at ¶ 55, quoting *Disciplinary Counsel v. Dann*, 2012-Ohio-5337, ¶ 22. In an effort to repair that damage and "'enhance public confidence in the integrity of [the judiciary],'" *id.*, quoting *O'Neill*, 2004-Ohio-4704, at ¶ 33, we suspended Celebrezze from the practice of law for two years, with one year stayed on the condition that she commit no further misconduct, *id.* at ¶ 56.

**{¶ 52}** After reviewing our applicable precedent, we find that Skelton's misconduct—which includes multiple ex parte communications, investigation of facts outside the record, abuse of the prestige of the judicial office by granting a motion for judicial release while blatantly disregarding the statutory requirements for such release, and a refusal to self-report the misconduct—is more serious than the misconduct at issue in *Hale*, 2014-Ohio-5053, and *Marshall*, 2019-Ohio-670, but less egregious than the misconduct at issue in *Celebrezze*. Therefore, we conclude that the appropriate sanction in this case is a one-year suspension with six months stayed on the condition that Skelton commit no further misconduct.

**CONCLUSION**

{¶ 53} Accordingly, Richard Steven Skelton is hereby suspended from the practice of law in Ohio for one year with six months stayed on the condition that he engage in no further misconduct. If Skelton fails to comply with the condition of the stay, the stay will be revoked and he will serve the entire one-year suspension. Costs are taxed to Skelton.

Judgment accordingly.

———————————

**FISCHER, J., joined by KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 54} I agree with the majority that respondent, former common-pleas-court judge Richard S. Skelton, violated six rules of the Code of Judicial Conduct and three professional-conduct rules. Those violations include manipulating the random assignment of cases to secure the early release of Aaron Cox, a convicted felon who was ineligible for early release, over the State's objection. I disagree, however, with the sanction the majority imposes. The majority states that it "'hold[s] judges to the highest standards of professional behavior'" yet imposes only a one-year suspension, with six months conditionally stayed, for behavior that undermines the judiciary and the rule of law. Majority opinion, ¶ 34, quoting *Disciplinary Counsel v. Carr*, 2022-Ohio-3633, ¶ 86. This court should suspend Skelton from the practice of law for 18 months with six months conditionally stayed. Thus, I respectfully concur in part and dissent in part.

**_Celebrezze_ Is the Most Analogous Case**

{¶ 55} "[J]udges are held to the highest possible standard of ethical conduct." *Ohio State Bar Assn. v. McCafferty*, 2014-Ohio-3075, ¶ 16. "The primary purposes of judicial discipline are to protect the public, to guarantee the evenhanded administration of justice, and to bolster public confidence in the institution." *Id.* at ¶ 20. By suspending Skelton for only one year with six months

conditionally stayed, the majority imposes a sanction that does not adequately reflect those principles.

{¶ 56} Although disciplinary matters are decided on a case-by-case basis, this court looks to similar cases to determine the appropriate sanction. *See Disciplinary Counsel v. Gallagher*, 1998-Ohio-592, ¶ 5. I agree with the majority that while *Disciplinary Counsel v. Kegley*, 2025-Ohio-910, and *Disciplinary Counsel v. Winters*, 2021-Ohio-2753, involve some of the same violations that are at issue in this case, specifically with respect to ex parte communications, neither of these precedents is truly instructive because they do not involve manipulation of the random assignment of cases, Skelton's most egregious violation. Rather, these precedents inform us merely that a stayed six-month suspension, as this court imposed in *Kegley* and *Winters*, is not an adequate sanction to protect the public and bolster public confidence in our legal system. *See Kegley* at ¶ 43; *Winters* at ¶ 40.

{¶ 57} The majority instead finds *Disciplinary Counsel v. Hale*, 2014-Ohio-5053, *Disciplinary Counsel v. Marshall*, 2019-Ohio-670, and *Disciplinary Counsel v. Celebrezze*, 2026-Ohio-45, instructive. However, like *Kegley* and *Winters*, neither *Hale* nor *Marshall* is entirely on point.

{¶ 58} In *Hale*, a municipal-court judge dismissed a speeding ticket for his personal attorney and falsely claimed that the prosecutor had requested the dismissal. He also engaged in ex parte communications and lied a second time after the media discovered the dismissal. However, Hale was the duty judge on the day of the dismissal and acted after his attorney failed to attend the arraignment and requested to be arraigned in absentia. We suspended Hale from the practice of law for six months with no time stayed. *Hale* at ¶ 40. While his conduct violated seven ethics rules, Hale did not attempt to manipulate the random assignment of cases. *See id.* at ¶ 27. Thus, *Hale* is not entirely on point and demonstrates only that Skelton deserves to be suspended from the practice of law for more than six months.

{¶ 59} Likewise, *Marshall* does not involve a judge who manipulated the random assignment of cases. Marshall, a common-pleas-court judge, abused his position by interfering with his daughter's speeding ticket, including engaging in ex parte communications and pressuring both an assistant prosecutor and a highway patrolman. We suspended Marshall from the practice of law for six months with no time stayed. *Id.* at ¶ 33. Although Marshall abused his power, he never attempted to alter its assignment. Thus, like *Hale*, *Marshall* is not entirely on point and demonstrates only that Skelton deserves to be suspended from the practice of law for more than six months.

{¶ 60} *Celebrezze*, 2026-Ohio-45, is the only case cited by the majority in which a judge manipulated the random assignment of cases. Celebrezze, a domestic-relations-court judge, had three divorce cases—and attempted to have a fourth—reassigned to herself. She did so in part to refer cases to her longtime friend and love interest as a receiver or mediator, then approved payment of over $400,000 in fees to him and his counsel over a two-year period. Celebrezze systematically used her position, enhanced by her role as an administrative judge, to manipulate the random assignment of cases, committing 15 ethics violations. *Id.* at ¶ 29. We suspended Celebrezze from the practice of law for two years with one year conditionally stayed. *Id.* at ¶ 56. Because *Celebrezze* is the only case involving manipulation of the random assignment of cases that is cited by the majority, it is the most instructive in determining the appropriate sanction here.

{¶ 61} Because *Celebrezze* is the most instructive case—whereas *Hale*, 2014-Ohio-5053, and *Marshall*, 2019-Ohio-670, are not wholly instructive and plainly demonstrate that Skelton deserves an actual suspension of more than six months—we should begin the sanction analysis by presuming that the sanction we imposed in *Celebrezze*—a two-year suspension with one year conditionally stayed—is warranted and reduce it if appropriate after comparing the nature of the misconduct and the applicable aggravating and mitigating factors in each case.

## Skelton's Conduct Warrants a Harsher Sanction than a One-Year Suspension with Six Months Conditionally Stayed

**{¶ 62}** The majority finds that Skelton's conduct is less egregious than Celebrezze's and therefore warrants only a one-year suspension with six months stayed on the condition that Skelton engage in no further misconduct. Compared to Celebrezze's misconduct, Skelton's may be less egregious—but not by much.

*Skelton and Celebrezze both committed grave misconduct by manipulating the random assignment of cases*

**{¶ 63}** Skelton's gravest misconduct was his deliberate manipulation of the random assignment of cases. The Rules of Superintendence require multijudge divisions of common-pleas courts to adopt policies that ensure the "[r]andom assignment of cases to judges of the division through an objective and impartial system that ensures the equitable distribution of cases between or among the judges of the division." Sup.R. 36.011(C)(2)(c). This court takes the same approach by randomly assigning opinions—a fundamental structural feature that distinguishes it from the United States Supreme Court.[1]

**{¶ 64}** Random assignment is not a matter of convenience. Indeed, it is intended "not only to avoid judge-shopping and to distribute cases equitably among judges, but also to maintain public confidence in the judicial system by ensuring that cases are assigned impartially and not deliberately to a certain judge." (Citation omitted.) *In re Disqualification of Celebrezze*, 2023-Ohio-4383, ¶ 99. When a

---

1. In the United States Supreme Court, "the Chief Justice, or the most senior Justice in the majority . . . , assigns a Justice in the majority to write the opinion of the Court." United States Courts, *Supreme Court Procedures*, https://www.uscourts.gov/about-federal-courts/educational-resources/about-educational-outreach/activity-resources/supreme-court-procedures (accessed Apr. 23, 2026) [https://perma.cc/E4DE-SQ2B]. In the Supreme Court of Ohio, "[t]he writing of the opinions is done by random selection." Supreme Court of Ohio, *The Supreme Court of Ohio & the Ohio Judicial System*, 5, available at https://www.supremecourt.ohio.gov/docs/Publications/OJSbrochure.pdf (accessed Apr. 23, 2026) [https://perma.cc/46UU-2DKS].

judge manipulates the assignment process, the harm extends beyond a single proceeding and strikes at the integrity of the court itself.

{¶ 65} Skelton deliberately interfered with the random assignment of Cox's cases. In doing so, he also engaged in frequent ex parte communication with Cox's mother, telling her he would ask to take over Cox's cases. And indeed, Skelton later spoke with Judge Krumholtz about transferring Cox's cases to himself. After Judge Krumholtz retired and the cases were transferred to another judge, who then denied Cox's motion for judicial release, Skelton continued to scheme with Cox's mother to secure her son's release from prison, informing her that Cox could file another motion for judicial release and meeting with her to discuss Cox's cases. While Skelton denies submitting the transfer order, the cases were miraculously transferred to his docket. Skelton then continued to communicate ex parte with both Cox and Cox's mother while arranging for Cox's early release, deciding by May 20 that he would release Cox from prison, well before the State filed its memorandum in opposition to judicial release. And over the State's objection and against the law, given that Cox was not eligible for early release, Skelton still decided to release Cox, a violent offender, from prison. Thus, Skelton's misconduct included not just his failure to recuse himself or the appearance of partiality but also his manipulation of the judicial system to do an unlawful favor for an acquaintance.

{¶ 66} By doing that unlawful favor for an acquaintance, Skelton usurped the power of the General Assembly for his own purposes. The separation of powers is one of the fundamental principles of a free constitution. *See Mistretta v. United States*, 488 U.S. 361, 380-381 (1989). And "[t]he power to prescribe the punishment for a crime belongs to the legislature." *State v. Daniel*, 2023-Ohio-4035, ¶ 16. The trial court merely has the powers to sentence and to grant judicial release as authorized by law. *See id.* While a judge should not be subject to disciplinary proceedings for making a "mere mistake in the exercise of judicial

discretion," like accidentally sentencing an offender outside the sentencing guidelines, we may appropriately discipline a judge for conduct that demonstrates a willful failure to follow the law. (Cleaned up.) *Disciplinary Counsel v. Hoover*, 2024-Ohio-4608, ¶ 65, 76; *Disciplinary Counsel v. Grendell*, 2025-Ohio-5239, ¶ 157-159. That is plainly what happened here.

{¶ 67} Skelton manipulated the random assignment of cases to proceed with his own agenda to release Cox—contrary to R.C. 2929.20, the judicial-release statute—as clearly demonstrated by his ex parte communications with Cox's mother. While Skelton maintains that he had not received the probation department's report declaring Cox ineligible for early release, Skelton said on the record that he had read the report. So either Skelton had read the report and ignored it, or he lied on the record about having read it. While both possibilities are plausible, it is clear from the record that no matter what the report said, Skelton was going to release Cox that day. Thus, when Skelton manipulated the case-assignment system with the intention to release a violent felon from prison contrary to the judicial-release statute, he went rogue—ignoring the General Assembly's power to prescribe punishment—and imposed his own will. The people did not elect Skelton to write the laws but, rather, to interpret and apply them. *See Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 71. His actions undermined the separation-of-powers doctrine, further depriving the people of an impartial judicial system.

{¶ 68} Moreover, by releasing a violent felon from prison prior to his eligibility, Skelton jeopardized public safety. Cox was in prison for convictions for four serious felonies: aggravated robbery, felonious assault, escape, and possession of a fentanyl-related compound. These convictions arose from one incident in which Cox robbed someone at knifepoint, another incident in which Cox had overdosed and was found unresponsive with drugs on his person, and another during which Cox knocked a law-enforcement officer to the ground during a

transfer to jail, jumped into the driver's seat of the officer's cruiser, and drove over the officer's arm while fleeing the scene.

{¶ 69} Soon after Skelton unlawfully released Cox from prison, Cox violated the terms of his probation when he failed to abstain from drugs and left the State without permission. While Cox was apprehended and returned to prison soon thereafter and did not commit further harm to the public, there is no doubt that the risk of recidivism was great. The record shows that Cox was under community control for six other cases when he was convicted of the four serious felony offenses. Even Cox admitted in his motion for judicial release that he had an extensive history with the court and had been given "numerous opportunities to find the right path." In that motion, Cox merely requested the opportunity to "demonstrate that he could walk the walk"; there was certainly no justification for his release before he had served most of his sentence for the four serious felony offenses. Thus, by granting Cox early release contrary to the judicial-release statute, Skelton jeopardized public safety—which this court should not take lightly.

{¶ 70} Given the gravity of Skelton's misconduct, a significant sanction is necessary to "help mend the 'incalculable harm [that Skelton's misconduct caused] to the public perception of the legal system,'" *Celebrezze*, 2026-Ohio-45, at ¶ 55, quoting *Disciplinary Counsel v. Dann*, 2012-Ohio-5337, ¶ 22.

*Some—but not all—of the aggravating and mitigating factors that applied in* Celebrezze *apply here*

{¶ 71} In comparing this case to *Celebrezze*, it could be argued that Celebrezze engaged in more egregious conduct because she repeatedly manipulated the case-assignment system for a friend's financial gain whereas Skelton manipulated it on only one occasion to do a favor for an acquaintance. And *Celebrezze* included the aggravating factor of a dishonest or selfish motive, which is absent here. *Id.* at ¶ 32, citing Gov.Bar R. V(13)(B)(2). But we cannot ignore that like Celebrezze, Skelton engaged in a pattern of misconduct and committed

multiple offenses, as Skelton's scheme to release Cox, a violent felon, from prison continued for almost two years and violated multiple ethics rules. *See id.* at ¶ 32; Gov.Bar R. V(13)(B)(3) and (4).

{¶ 72} It could also be argued that the financial harm that Celebrezze likely caused once she had manipulated the case-assignment system[2] makes her conduct more egregious than Skelton's. But Celebrezze's misconduct did not involve criminal cases; unlike Skelton, she did not jeopardize public safety by letting a violent felon out of prison before he had served his sentence, in contravention of the judicial-release statute. Therefore, although egregious in a different manner than Celebrezze's misconduct, Skelton's misconduct arguably warrants the same sanction.

{¶ 73} Importantly, though, this case involves two mitigating factors not present in *Celebrezze*: the absence of a dishonest or selfish motive and the judge's resignation prior to the disciplinary hearing. In my view, these factors justify a slight reduction from the two-year suspension, with one year conditionally stayed,

---

2. There is little doubt that Celebrezze's misconduct caused financial harm in *Jardine v. Jardine*, Cuyahoga C.P. No. DR-20-383667, one of the cases she had assigned to herself. Jason Jardine, the plaintiff in that case, alleged that Dottore's fees and expenses were excessive and that Celebrezze had engaged "in a pattern of rubber-stamping [Dottore's] requests without holding a hearing or giving Jardine an opportunity to be heard." *In re Disqualification of Celebrezze*, 2023-Ohio-4383, ¶ 17, 20. Indeed, Celebrezze approved $241,935 in receiver fees to Dottore and $171,859.31 in legal fees to Dottore's attorney. *Disciplinary Counsel v. Celebrezze* at ¶ 11. While Jardine's allegations alone do not demonstrate that these fees were not earned, Celebrezze's relationship with Dottore certainly placed them in question. And in fact, the newly assigned judge in *Jardine* determined that there had been a $79,422.60 overpayment in receiver fees and that there should have been no payment of legal fees to Dottore's attorney. Cuyahoga C.P. No. DR-20-38366 (Dec. 18, 2025), available at https://s3.documentcloud.org/documents/26456454/jardine-judgment-entry.pdf (accessed Apr. 29, 2026) [https://perma.cc/X42X-ZZ4K]. Because of Celebrezze's actions, Jardine felt the need to hire a private investigator, unlikely an inexpensive endeavor, to investigate Celebrezze's blatant favoritism toward Dottore, ultimately uncovering the improper connection between them. *See Disciplinary Counsel v. Celebrezze* at ¶ 12; *In re Disqualification of Celebrezze* at ¶ 38. And Jardine likely accumulated additional legal fees when seeking, with counsel, to disqualify Celebrezze from presiding over his divorce case due to the blatant appearance of impropriety and her failure to recuse herself. *See In re Disqualification of Celebrezze* at ¶ 1. All that is to say that although we did not attribute aggravating weight to it in Celebrezze's disciplinary case, financial harm likely resulted from her misconduct.

that we imposed in *Celebrezze*. *See* Gov.Bar R. V(13)(C)(2) and (9); *id.* at ¶ 1 (noting that Celebrezze resigned less than a month before release of our decision). On the other hand, the grave nature of the most egregious misconduct in both cases—manipulation of the case-assignment process—justifies prohibiting Skelton from practicing law for the same amount of time. Therefore, this court should suspend Skelton from the practice of law for 18 months with six months stayed on the condition of no further misconduct.

## Conclusion

{¶ 74} The majority correctly finds that in addition to manipulating the case-assignment process, Skelton engaged in multiple ex parte communications, investigated facts outside the record, abused the prestige of the judicial office, released a violent felon from prison in contravention of the judicial release-statute, and refused to self-report the misconduct. But by treating Skelton's manipulation of the random assignment of cases as merely one violation among many, the majority understates its significance.

{¶ 75} Whereas a failure to recuse or an abuse of power calls into question a judge's impartiality, manipulation of the case-assignment process is categorically different. It corrupts the judicial system at its foundation. This behavior is ethically and morally wrong, and the sanction imposed for such misconduct must reflect the gravity of the harm it causes. Moreover, a harsh sanction is warranted when a judge violates the separation-of-powers doctrine that is fundamental to our free Constitution and jeopardizes public safety by blatantly disregarding the judicial-release statute to allow a violent offender to be released from prison before the offender becomes eligible to be released.

{¶ 76} Accordingly, Skelton should be suspended for 18 months with six months stayed on the condition of no further misconduct. I therefore dissent from the court's imposition of a less severe sanction.

_____

Joseph M. Caligiuri, Disciplinary Counsel, and Paige A. Melton, for relator.

Bieser, Greer & Landis, L.L.P., and David C. Greer, for respondent.

_____